## CORNING GLASS WORKS *v.* BRENNAN, SECRETARY OF LABOR

No. 73–29. Argued March 25, 1974—Decided June 3, 1974*

---

*Together with No. 73–695, *Brennan, Secretary of Labor* v. *Corning Glass Works,* on certiorari to the Court of Appeals for the Third Circuit.

MARSHALL, J., delivered the opinion of the Court, in which DOUGLAS, BRENNAN, WHITE, and POWELL, JJ., joined. BURGER, C. J., and BLACKMUN and REHNQUIST, JJ., filed a dissenting statement, *post*, p. 210. STEWART, J., took no part in the consideration or decision of the cases.

*Scott F. Zimmerman* argued the cause for petitioner in No. 73–29 and for respondent in No. 73–695. With him on the briefs was *Walter P. DeForest III.*

*Allan Abbot Tuttle* argued the cause for petitioner in No. 73–695 and for respondent in No. 73–29. With him on the brief were *Solicitor General Bork, Deputy Solici-*

tor *General Wallace, Sylvia S. Ellison,* and *Helen W. Judd.*†

MR. JUSTICE MARSHALL delivered the opinion of the Court.

These cases arise under the Equal Pay Act of 1963, 77 Stat. 56, § 3, 29 U. S. C. § 206 (d)(1),[1] which added to § 6 of the Fair Labor Standards Act of 1938 the principle of equal pay for equal work regardless of sex. The principal question posed is whether Corning Glass Works violated the Act by paying a higher base wage to male night shift inspectors than it paid to female inspectors performing the same tasks on the day shift, where the higher wage was paid in addition to a separate night shift differential paid to all employees for night work. In No. 73–29, the Court of Appeals for the Second Circuit, in a case involving several Corning plants in Corning, New York, held that this practice vio-

---

†Briefs of *amici curiae* were filed in both cases by *Milton Smith, Gerard C. Smetana, Lawrence D. Ehrlich,* and *Jerry Kronenberg* for the Chamber of Commerce of the United States, and by *Ruth Bader Ginsburg* and *Melvin L. Wulf* for the American Civil Liberties Union et al.

[1] "No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided,* That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee."

lated the Act. 474 F. 2d 226 (1973). In No. 73–695, the Court of Appeals for the Third Circuit, in a case involving a Corning plant in Wellsboro, Pennsylvania, reached the opposite conclusion. 480 F. 2d 1254 (1973). We granted certiorari and consolidated the cases to resolve this unusually direct conflict between two circuits. 414 U. S. 1110 (1973). Finding ourselves in substantial agreement with the analysis of the Second Circuit, we affirm in No. 73–29 and reverse in No. 73–695.

I

Prior to 1925, Corning operated its plants in Wellsboro and Corning only during the day, and all inspection work was performed by women. Between 1925 and 1930, the company began to introduce automatic production equipment which made it desirable to institute a night shift. During this period, however, both New York and Pennsylvania law prohibited women from working at night.[2] As a result, in order to fill inspector positions on the new night shift, the company had to recruit male employees from among its male dayworkers. The male employees so transferred demanded and received wages substantially higher than those paid to women inspectors engaged on the two day shifts.[3] During this same period, however,

[2] New York prohibited the employment of women between 10 p. m. and 6 a. m. See 1927 N. Y. Laws, c. 453; 1930 N. Y. Laws, c. 868. Pennsylvania also prohibited them from working between 10 p. m. and 6 a. m. See Act of July 25, 1913, Act No. 466, Pa. Laws 1913.

[3] Higher wages were demanded in part because the men had been earning more money on their day shift jobs than women were paid for inspection work. Thus, at the time of the creation of the new night shift, female day shift inspectors received wages ranging from 20 to 30 cents per hour. Most of the men designated to fill the newly created night shift positions had been working in the blowing room where the lowest wage rate was 48 cents per hour and where additional incentive pay could be earned. As night shift inspectors these men received 53 cents per hour. There is also some evidence

no plant-wide shift differential existed and male employees working at night, other than inspectors, received the same wages as their day shift counterparts. Thus a situation developed where the night inspectors were all male,[4] the day inspectors all female, and the male inspectors received significantly higher wages.

In 1944, Corning plants at both locations were organized by a labor union and a collective-bargaining agreement was negotiated for all production and maintenance employees. This agreement for the first time established a plant-wide shift differential,[5] but this change did not eliminate the higher base wage paid to male night inspectors. Rather, the shift differential was superimposed on the existing difference in base wages between male night inspectors and female day inspectors.

Prior to June 11, 1964, the effective date of the Equal Pay Act,[6] the law in both Pennsylvania and New York

---

in the record that additional compensation was necessary because the men viewed inspection jobs as "demeaning" and as "women's work."

[4] A temporary exception was made during World War II when manpower shortages caused Corning to be permitted to employ women on the steady night shift inspection jobs at both locations. It appears that women night inspectors during this period were paid the same higher night shift wages earned by the men.

[5] The shift differential was originally three cents an hour for the afternoon shift and five cents an hour for the night shift. It has been increased to 10 and 16 cents per hour respectively.

[6] Section 4 of the Equal Pay Act provided that the Act would take effect upon the expiration of one year from June 10, 1963, the date of its enactment, except that in the case of employees covered by a bona fide collective-bargaining agreement in effect at least 30 days prior to the date of enactment, the Act would take effect upon the termination of such collective-bargaining agreement. It is conceded that the Act became effective with respect to the Corning, New York, plants on June 11, 1964, though it is also stipulated that the statute of limitations barred all claims for backpay prior to November 1, 1964. With respect to the Wellsboro plant, there is

was amended to permit women to work at night.[7]   It was not until some time after the effective date of the Act, however, that Corning initiated efforts to eliminate

apparently some dispute between the company and the Secretary as to when the Act took effect.  Corning evidently believes the Act took effect on January 20, 1965, because of an outstanding collective-bargaining agreement.  The Secretary claims that this agreement was reopened on January 24, 1964, and that the plant therefore became subject to the Act's requirements on June 11, 1964, one year after enactment.  We see no need to resolve this question as it appears that, in any event, the parties agree the statute of limitations bars recovery of back wages for any violation prior to October 1966.

[7] In New York, a 1953 amendment allowed females over the age of 21 to work after midnight in factories operating multiple shifts where the Industrial Commissioner found transportation and safety conditions to be satisfactory and granted approval.  See 1953 N. Y. Laws, c. 708, amending N. Y. Labor Law § 172, formerly codified in N. Y. Labor Law § 173 (3)(a)(1)  (1965).  In Pennsylvania, the law was amended in 1947 to permit women to work at night conditioned upon the approval of the State Department of Labor and Industry, Pa. Laws 1947, Act No. 543, p. 1397, codified in Pa. Stat. Ann., Tit. 43, § 104 (Supp. 1974–1975), but state regulations required that, in order to obtain approval to employ women at night, an employer was required to furnish transportation where public transportation was not available.  The District Court in No. 73–695 found that public transportation was not available in Wellsboro and that it was not economically feasible for Corning to furnish transportation for its female employees.  In July 1965, however, the Pennsylvania regulations were amended to permit employers to hire women at night where regular private transportation is available.  Pa. Dept. of Labor and Industry, Regulations Relating to Hours of Work and Conditions of Employment of Women in Pa., Rule S–8 (c) (1966).

In 1969, both New York and Pennsylvania repealed, either expressly or by implication, those special night-work restrictions for women cited above.  See 2 N. Y. Laws 1969, c. 1042, § 2, p. 2630, repealing N. Y. Labor Law § 173.3.a (1) (1965) and replacing it with § 177.1 (c), which was subsequently repealed in 1973, 1 N. Y. Laws 1973, c. 377, § 11, p. 1336; Pa. Laws 1969, Act No. 56, p. 133, which, by including sex as a prohibited form of discrimination, Pa.

the differential rates for male and female inspectors. Beginning in June 1966, Corning started to open up jobs on the night shift to women. Previously separate male and female seniority lists were consolidated and women became eligible to exercise their seniority, on the same basis as men, to bid for the higher paid night inspection jobs as vacancies occurred.

On January 20, 1969, a new collective-bargaining agreement went into effect, establishing a new "job evaluation" system for setting wage rates. The new agreement abolished for the future the separate base wages for day and night shift inspectors and imposed a uniform base wage for inspectors exceeding the wage rate for the night shift previously in effect. All inspectors hired after January 20, 1969, were to receive the same base wage, whatever their sex or shift. The collective-bargaining agreement further provided, however, for a higher "red circle" rate for employees hired prior to January 20, 1969, when working as inspectors on the night shift. This "red circle" rate served essentially to perpetuate the differential in base wages between day and night inspectors.

The Secretary of Labor brought these cases to enjoin Corning from violating the Equal Pay Act [8] and to collect back wages allegedly due female employees because of past violations. Three distinct questions are presented:

Stat. Ann., Tit. 43, § 951 *et seq.* (Supp. 1974–1975), impliedly voided all laws and regulations specifically protecting one sex. See Op. Atty. Gen. No. 69–304, Dec. 5, 1969.

[8] The District Court in No. 73–29 issued a broadly worded injunction against all future violations of the Act. The Court of Appeals modified the injunction by limiting it to inspectors at the three plants at issue in that case, largely because of that court's belief that "Corning had been endeavoring since 1966—sincerely, if ineffectively—to bring itself into compliance." 474 F. 2d 226, 236 (CA2 1973). Since the Government did not seek certiorari from this aspect of the Second Circuit's judgment, we have no occasion to consider this question.

(1) Did Corning ever violate the Equal Pay Act by paying male night shift inspectors more than female day shift inspectors? (2) If so, did Corning cure its violation of the Act in 1966 by permitting women to work as night shift inspectors? (3) Finally, if the violation was not remedied in 1966, did Corning cure its violation in 1969 by equalizing day and night inspector wage rates but establishing higher "red circle" rates for existing employees working on the night shift?

## II

Congress' purpose in enacting the Equal Pay Act was to remedy what was perceived to be a serious and endemic problem of employment discrimination in private industry—the fact that the wage structure of "many segments of American industry has been based on an ancient but outmoded belief that a man, because of his role in society, should be paid more than a woman even though his duties are the same." S. Rep. No. 176, 88th Cong., 1st Sess., 1 (1963). The solution adopted was quite simple in principle: to require that "equal work will be rewarded by equal wages." *Ibid.*

The Act's basic structure and operation are similarly straightforward. In order to make out a case under the Act, the Secretary must show that an employer pays different wages to employees of opposite sexes "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." Although the Act is silent on this point, its legislative history makes plain that the Secretary has the burden of proof on this issue,[9] as both of the courts below recognized.[10]

---

[9] See 109 Cong. Rec. 9196 (1963) (Rep. Frelinghuysen); 109 Cong. Rec. 9208 (Rep. Goodell).

[10] *Hodgson* v. *Corning Glass Works,* 474 F. 2d 226, 231 (CA2 1973); *Brennan* v. *Corning Glass Works,* 480 F. 2d 1254, 1258 (CA3

The Act also establishes four exceptions—three specific and one a general catchall provision—where different payment to employees of opposite sexes "is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." Again, while the Act is silent on this question, its structure and history also suggest that once the Secretary has carried his burden of showing that the employer pays workers of one sex more than workers of the opposite sex for equal work, the burden shifts to the employer to show that the differential is justified under one of the Act's four exceptions. All of the many lower courts that have considered this question have so held,[11] and this view is consistent with the general rule that the application of an exemption under the Fair Labor

1973). See also *Hodgson* v. *Behrens Drug Co.,* 475 F. 2d 1041, 1049 (CA5 1973); *Hodgson* v. *Golden Isles Convalescent Homes, Inc.,* 468 F. 2d 1256, 1257 (CA5 1972); *Hodgson* v. *Fairmont Supply Co.,* 454 F. 2d 490, 493 (CA4 1972); *Hodgson* v. *Brookhaven General Hospital,* 436 F. 2d 719, 722 (CA5 1970); *Shultz* v. *American Can Co.-Dixie Products,* 424 F. 2d 356, 360 (CA8 1970).

[11] See *Hodgson* v. *Corning Glass Works, supra,* at 231; *Brennan* v. *Corning Glass Works, supra,* at 1258; *Hodgson* v. *Robert Hall Clothes, Inc.,* 473 F. 2d 589, 597 (CA3), cert. denied *sub nom. Brennan* v. *Robert Hall Clothes, Inc.,* 414 U. S. 866 (1973); *Hodgson* v. *Security Nat. Bank of Sioux City,* 460 F. 2d 57, 59 n. 4 (CA8 1972); *Shultz* v. *Wheaton Glass Co.,* 421 F. 2d 259, 266 (CA3), cert. denied, 398 U. S. 905 (1970); *Shultz* v. *American Can Co., supra,* at 362; *Shultz* v. *First Victoria Nat. Bank,* 420 F. 2d 648, 654 n. 8 (CA5 1969); *Hodgson* v. *Industrial Bank of Savannah,* 347 F. Supp. 63, 67 (SD Ga. 1972); *Hodgson* v. *Maison Miramon, Inc.,* 344 F. Supp. 843, 845 (ED La. 1972); *Hodgson* v. *J. W. Lyles, Inc.,* 335 F. Supp. 128, 131 (Md. 1971), aff'd, 468 F. 2d 625 (CA4 1972); *Hodgson* v. *City Stores, Inc.,* 332 F. Supp. 942, 947 (MD Ala. 1971); *Shultz* v. *Kimberly-Clark Corp.,* 315 F. Supp. 1323, 1332 (WD Tenn. 1970); *Wirtz* v. *Basic Inc.,* 256 F. Supp. 786, 790 (Nev. 1966). See also 29 CFR § 800.141 (1973).

Standards Act is a matter of affirmative defense on which the employer has the burden of proof.[12]

The contentions of the parties in this case reflect the Act's underlying framework. Corning argues that the Secretary has failed to prove that Corning ever violated the Act because day shift work is not "performed under similar working conditions" as night shift work. The Secretary maintains that day shift and night shift work are performed under "similar working conditions" within the meaning of the Act.[13] Although the Secretary recognizes that higher wages may be paid for night shift work, the Secretary contends that such a shift differential would be based upon a "factor other than sex" within the catch-all exception to the Act and that Corning has failed to carry its burden of proof that its higher base wage for male night inspectors was in fact based on any factor other than sex.

The courts below relied in part on conflicting statements in the legislative history having some bearing on

---

[12] See *A. H. Phillips, Inc.* v. *Walling,* 324 U. S. 490, 493 (1945); *Arnold* v. *Ben Kanowsky, Inc.,* 361 U. S. 388, 392 (1960); *Walling* v. *General Industries Co.,* 330 U. S. 545, 547–548 (1947); *Mitchell* v. *Kentucky Finance Co.,* 359 U. S. 290, 295 (1959).

[13] The Secretary also advances an argument that even if night and day inspection work is assumed not to be performed under similar working conditions, the differential in base wages is nevertheless unlawful under the Act. The additional burden of working at night, the argument goes, was already fully reflected in the plant-wide shift differential, and the shifts were made "similar" by payment of the shift differential. This argument does not appear to have been presented to either the Second or the Third Circuit, as the opinions in both cases reflect an assumption on the part of all concerned that the Secretary's case would fail unless night and day inspection work was found to be performed under similar working conditions. For this reason, and in view of our resolution of the "working condition" issue, we have no occasion to consider and intimate no views on this aspect of the Secretary's argument.

198

this question of statutory construction. The Third Circuit found particularly significant a statement of Congressman Goodell, a sponsor of the Equal Pay bill, who, in the course of explaining the bill on the floor of the House, commented that "standing as opposed to sitting, pleasantness or unpleasantness of surroundings, periodic rest periods, hours of work, *difference in shift,* all would logically fall within the working condition factor." 109 Cong. Rec. 9209 (1963) (emphasis added). The Second Circuit, in contrast, relied on a statement from the House Committee Report which, in describing the broad general exception for differentials "based on any other factor other than sex," stated: "Thus, among other things, shift differentials . . . would also be excluded. . . ." H. R. Rep. No. 309, 88th Cong., 1st Sess., 3 (1963).

We agree with Judge Friendly, however, that in this case a better understanding of the phrase "performed under similar working conditions" can be obtained from a consideration of the way in which Congress arrived at the statutory language than from trying to reconcile or establish preferences between the conflicting interpretations of the Act by individual legislators or the committee reports. As Mr. Justice Frankfurter remarked in an earlier case involving interpretation of the Fair Labor Standards Act, "regard for the specific history of the legislative process that culminated in the Act now before us affords more solid ground for giving it appropriate meaning." *United States* v. *Universal C. I. T. Credit Corp.,* 344 U. S. 218, 222 (1952).

The most notable feature of the history of the Equal Pay Act is that Congress recognized early in the legislative process that the concept of equal pay for equal work was more readily stated in principle than reduced to statutory language which would be meaningful to employers and workable across the broad range of industries covered

by the Act. As originally introduced, the Equal Pay bill required equal pay for "equal work on jobs the performance of which requires equal skills." There were only two exceptions—for differentials "made pursuant to a seniority or merit increase system which does not discriminate on the basis of sex. . . ." [14]

In both the House and Senate committee hearings, witnesses were highly critical of the Act's definition of equal work and of its exemptions. Many noted that most of American industry used formal, systematic job evaluation plans to establish equitable wage structures in their plants.[15] Such systems, as explained coincidentally by a representative of Corning Glass Works who testified at both hearings, took into consideration four separate factors in determining job value—skill, effort, responsibility and working conditions—and each of these four components was further systematically divided into various subcomponents.[16] Under a job evaluation plan, point values are assigned to each of the subcomponents of a given job, resulting in a total point figure representing a relatively objective measure of the job's value.

In comparison to the rather complex job evaluation plans used by industry, the definition of equal work used in the first drafts of the Equal Pay bill was criticized as

---

[14] See S. 882, 88th Cong., 1st Sess., § 4 (1963); cf. S. 910, 88th Cong., 1st Sess., § 4 (a) (1963).

[15] See, e. g., Hearings On Equal Pay Act of 1963 before the Subcommittee on Labor of the Senate Committee on Labor and Public Welfare, 88th Cong., 1st Sess., 26, 73, 79, 124, 140, 178 (1963) (hereinafter Senate Hearings); Hearings on Equal Pay Act before the Special Subcommittee on Labor of the House Committee on Education and Labor, 88th Cong., 1st Sess., 145–146 (1963) (hereinafter House Hearings).

[16] See Senate Hearings 96–104; House Hearings 232–240. See also House Hearings 304–305, 307–308.

unduly vague and incomplete. Industry representatives feared that as a result of the bill's definition of equal work, the Secretary of Labor would be cast in the position of second-guessing the validity of a company's job evaluation system. They repeatedly urged that the bill be amended to include an exception for job classification systems, or otherwise to incorporate the language of job evaluation into the bill.[17] Thus Corning's own representative testified:

"Job evaluation is an accepted and tested method of attaining equity in wage relationship..

"A great part of industry is committed to job evaluation by past practice and by contractual agreement as the basis for wage administration.

" 'Skill' alone, as a criterion, fails to recognize other aspects of the job situation that affect job worth.

"We sincerely hope that this committee in passing legislation to eliminate wage differences based on sex alone, will recognize in its language the general role of job evaluation in establishing equitable rate relationship." [18]

We think it plain that in amending the bill's definition of equal work to its present form, the Congress acted in direct response to these pleas. Spokesmen for the amended bill stated, for example, during the House debates:

"The concept of equal pay for jobs demanding equal skill has been expanded to require also equal effort, responsibility, and similar working conditions. These factors are the core of all job classification

---

[17] See, e. g., Senate Hearings 73, 74, 79, 124, 130, 138, 140, 178; House Hearings 145, 146, 159, 199–200.

[18] Senate Hearings 98; House Hearings 234.

systems. They form a legitimate basis for differentials in pay." [19]

Indeed, the most telling evidence of congressional intent is the fact that the Act's amended definition of equal work incorporated the specific language of the job evaluation plan described at the hearings by Corning's own representative—that is, the concepts of "skill," "effort," "responsibility," and "working conditions."

Congress' intent, as manifested in this history, was to use these terms to incorporate into the new federal Act the well-defined and well-accepted principles of job evaluation so as to ensure that wage differentials based upon bona fide job evaluation plans would be outside the purview of the Act. The House Report emphasized:

"This language recognizes that there are many factors which may be used to measure the relationships between jobs and which establish a valid basis for a difference in pay. These factors will be found in a majority of the job classification systems. Thus, it is anticipated that a bona fide job classification program that does not discriminate on the basis of sex will serve as a valid defense to a charge of discrimination." H. R. Rep. No. 309, *supra,* at 3.

It is in this light that the phrase "working conditions" must be understood, for where Congress has used technical words or terms of art, "it [is] proper to explain them by reference to the art or science to which they [are] appropriate." *Greenleaf* v. *Goodrich,* 101 U. S. 278, 284 (1880). See also *NLRB* v. *Highland Park Mfg. Co.,* 341 U. S. 322, 326 (1951) (Frankfurter, J., dissenting). This principle is particularly salutary where, as

_____

[19] 109 Cong. Rec. 9195 (1963) (Rep. Frelinghuysen). See also H. R. Rep. No. 309, 88th Cong., 1st Sess., 8 (1963).

here, the legislative history reveals that Congress incorporated words having a special meaning within the field regulated by the statute so as to overcome objections by industry representatives that statutory definitions were vague and incomplete.

While a layman might well assume that time of day worked reflects one aspect of a job's "working conditions," the term has a different and much more specific meaning in the language of industrial relations. As Corning's own representative testified at the hearings, the element of working conditions encompasses two subfactors: "surroundings" and "hazards." [20] "Surroundings" measures the elements, such as toxic chemicals or fumes, regularly encountered by a worker, their intensity, and their frequency. "Hazards" takes into account the physical hazards regularly encountered, their frequency, and the severity of injury they can cause. This definition of "working conditions" is not only manifested in Corning's own job evaluation plans but is also well accepted across a wide range of American industry.[21]

Nowhere in any of these definitions is time of day worked mentioned as a relevant criterion. The fact of the matter is that the concept of "working conditions," as used in the specialized language of job evaluation systems, simply does not encompass shift differentials. Indeed, while Corning now argues that night inspection work is not equal to day inspection work, all of its own job evaluation plans, including the one now in effect, have consistently treated them as equal in all respects,

---

[20] Senate Hearings 98–99; House Hearings 234–236.

[21] See D. Belcher, Wage and Salary Administration 271–274, 278, 287–289 (1955); 2 United States Dept. of Labor, Dictionary of Occupational Titles 656 (3d ed. 1965); United States Civil Service Commission, Job Grading System for Trades and Labor Occupations, F. P. M. Supp. 512–1, p. A3–3 (1970).

including working conditions.[22]   And Corning's Manager of Job Evaluation testified in No. 73–29 that time of day worked was not considered to be a "working condition." [23] Significantly, it is not the Secretary in this case who is trying to look behind Corning's bona fide job evaluation system to require equal pay for jobs which Corning has historically viewed as unequal work.   Rather, it is Corning which asks us to differentiate between jobs which the company itself has always equated.   We agree with the Second Circuit that the inspection work at issue in this case, whether performed during the day or night, is "equal work" as that term is defined in the Act.[24]

---

[22] Pursuant to its 1944 collective-bargaining agreement, Corning adopted a job classification system developed by its consultants, labeled the SJ&H plan, which evaluated inspector jobs on the basis of "general schooling," "training period," "manual skill," "versatility," "job knowledge," "responsibility," and "working conditions." Under this evaluation, the inspector jobs, regardless of shift, were found equal in all respects, including "working conditions," which were defined as the "surrounding conditions (wet, heat, cold, dust, grease, noises, etc.) and physical hazards (bruises, cuts, heavy lifting, fumes, slippery floors, machines, chemicals, gases, bodily injuries, etc.) to which employees are unavoidably subjected while performing the duties."

A new plan, put into effect in 1963–1964 and called the CGW plan, also found no significant differences in the duties performed by men and women inspectors and awarded the same point values for skill, effort, responsibility, and working conditions, regardless of shift.

[23] App. 66.

[24] In No. 73–29, Corning also claimed that the night inspection work was not equal to day shift inspection work because night shift inspectors had to do a certain amount of packing, lifting, and cleaning which was not performed by day shift inspectors.   Noting that it is now well settled that jobs need not be identical in every respect before the Equal Pay Act is applicable, the Court of Appeals concluded that the extra work performed by night inspectors was of so little consequence that the jobs remained substantially equal. See 474 F. 2d, at 234.   See also *Shultz* v. *Wheaton Glass Co.,*

This does not mean, of course, that there is no room in the Equal Pay Act for nondiscriminatory shift differentials. Work on a steady night shift no doubt has psychological and physiological impacts making it less attractive than work on a day shift. The Act contemplates that a male night worker may receive a higher wage than a female day worker, just as it contemplates that a male employee with 20 years' seniority can receive a higher wage than a woman with two years' seniority. Factors such as these play a role under the Act's four exceptions—the seniority differential under the specific seniority exception, the shift differential under the catch-all exception for differentials "based on any other factor other than sex." [25]

The question remains, however, whether Corning carried its burden of proving that the higher rate paid for night inspection work, until 1966 performed solely by men, was in fact intended to serve as compensation for night work, or rather constituted an added payment based upon sex. We agree that the record amply supports the District Court's conclusion that Corning had not sustained its burden of proof. [26] As its history revealed,

421 F. 2d, at 265; *Shultz* v. *American Can Co.*, 424 F. 2d, at 360; *Hodgson* v. *Fairmont Supply Co.*, 454 F. 2d, at 493. The company has not pursued this issue here.

[25] An administrative interpretation by the Wage and Hour Administrator recognizes the legitimacy of night shift differentials shown to be based on a factor other than sex. See 29 CFR § 800.145 (1973).

[26] This question, as well as the questions discussed in Part III, *infra*, were considered by the District Court and the Court of Appeals only in No. 73–29, and not in No. 73–695, since in the latter case the courts below concluded that the Secretary had failed to prove that night and day shift inspection work was performed under similar working conditions. We deal with these issues, then, only on the basis of the record in No. 73–29. To the extent that there are any differences in the records in these two cases on factual

"the higher night rate was in large part the product of the generally higher wage level of male workers and the need to compensate them for performing what were regarded as demeaning tasks." 474 F. 2d, at 233. The differential in base wages originated at a time when no other night employees received higher pay than corresponding day workers, and it was maintained long after the company instituted a separate plant-wide shift differential which was thought to compensate adequately for the additional burdens of night work. The differential arose simply because men would not work at the low rates paid women inspectors, and it reflected a job market in which Corning could pay women less than men for the same work. That the company took advantage of such a situation may be understandable as a matter of economics, but its differential nevertheless became illegal once Congress enacted into law the principle of equal pay for equal work.

## III

We now must consider whether Corning continued to remain in violation of the Act after 1966 when, without changing the base wage rates for day and night inspectors, it began to permit women to bid for jobs on the night shift as vacancies occurred. It is evident that this was more than a token gesture to end discrimination, as turnover in the night shift inspection jobs was rapid. The record in No. 73–29 shows, for example, that during the two-year period after June 1, 1966, the date women were first permitted to bid for night inspection jobs, women took 152 of the 278 openings, and women with very little seniority were able to obtain positions on the night shift.

matters relating to these questions, we leave it to the District Court and the Court of Appeals in No. 73–695 to resolve these questions, in the first instance, on the basis of the record created in that case.

Relying on these facts, the company argues that it ceased discriminating against women in 1966, and was no longer in violation of the Equal Pay Act.

But the issue before us is not whether the company, in some abstract sense, can be said to have treated men the same as women after 1966. Rather, the question is whether the company remedied the specific violation of the Act which the Secretary proved. We agree with the Second Circuit, as well as with all other circuits that have had occasion to consider this issue, that the company could not cure its violation except by equalizing the base wages of female day inspectors with the higher rates paid the night inspectors. This result is implicit in the Act's language, its statement of purpose, and its legislative history.

As the Second Circuit noted, Congress enacted the Equal Pay Act "[r]ecognizing the weaker bargaining position of many women and believing that discrimination in wage rates represented unfair employer exploitation of this source of cheap labor." 474 F. 2d, at 234. In response to evidence of the many families dependent on the income of working women, Congress included in the Act's statement of purpose a finding that "the existence . . . of wage differentials based on sex . . . depresses wages and living standards for employees necessary for their health and efficiency." Pub. L. 88–38, § 2 (a) (1), 77 Stat. 56 (1963). And Congress declared it to be the policy of the Act to correct this condition. § 2 (b).

To achieve this end, Congress required that employers pay equal pay for equal work and then specified:

> "*Provided,* That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee." 29 U. S. C. § 206 (d)(1).

The purpose of this proviso was to ensure that to remedy violations of the Act, "[t]he lower wage rate must be increased to the level of the higher." H. R. Rep. No. 309, *supra*, at 3. Comments of individual legislators are all consistent with this view. Representative Dwyer remarked, for example, "The objective of equal pay legislation . . . is not to drag down men workers to the wage levels of women, but to raise women to the levels enjoyed by men in cases where discrimination is still practiced." [27] Representative Griffin also thought it clear that "[t]he only way a violation could be remedied under the bill . . . is for the lower wages to be raised to the higher." [28]

By proving that after the effective date of the Equal Pay Act, Corning paid female day inspectors less than male night inspectors for equal work, the Secretary implicitly demonstrated that the wages of female day shift inspectors were unlawfully depressed and that the fair wage for inspection work was the base wage paid to male inspectors on the night shift. The whole purpose of the Act was to require that these depressed wages be raised, in part as a matter of simple justice to the employees themselves, but also as a matter of market economics, since Congress recognized as well that discrimination in wages on the basis of sex "constitutes an unfair method of competition." Pub. L. 88–38, *supra*, § 2 (a)(5).

We agree with Judge Friendly that

> "In light of this apparent congressional understanding, we cannot hold that Corning, by allowing some—or even many—women to move into the higher paid night jobs, achieved full compliance with the Act. Corning's action still left the inspectors on the day shift—virtually all women—earning a lower

---

[27] 109 Cong. Rec. 2714 (1963).

[28] House Hearings, *supra*, n. 15, at 65. See also 109 Cong. Rec. 9196 (Rep. Thompson).

base wage than the night shift inspectors because of a differential initially based on sex and still not justified by any other consideration; in effect, Corning was still taking advantage of the availability of female labor to fill its day shift at a differentially low wage rate not justified by any factor other than sex." 474 F. 2d, at 235.

The Equal Pay Act is broadly remedial, and it should be construed and applied so as to fulfill the underlying purposes which Congress sought to achieve. If, as the Secretary proved, the work performed by women on the day shift was equal to that performed by men on the night shift, the company became obligated to pay the women the same base wage as their male counterparts on the effective date of the Act. To permit the company to escape that obligation by agreeing to allow some women to work on the night shift at a higher rate of pay as vacancies occurred would frustrate, not serve, Congress' ends. See *Shultz* v. *American Can Co.-Dixie Products,* 424 F. 2d 356, 359 (CA8 1970); *Hodgson* v. *Miller Brewing Co.,* 457 F. 2d 221, 227 (CA7 1972); *Hodgson* v. *Square D Co.,* 459 F. 2d 805, 808–809 (CA6 1972).

The company's final contention—that it cured its violation of the Act when a new collective-bargaining agreement went into effect on January 20, 1969—need not detain us long. While the new agreement provided for equal base wages for night or day inspectors hired after that date, it continued to provide unequal base wages for employees hired before that date, a discrimination likely to continue for some time into the future because of a large number of laid-off employees who had to be offered re-employment before new inspectors could be hired. After considering the rather complex method in which the new wage rates for employees hired prior to January 1969 were calculated and the company's stated purpose

behind the provisions of the new agreement, the District Court in No. 73–29 concluded that the lower base wage for day inspectors was a direct product of the company's failure to equalize the base wages for male and female inspectors as of the effective date of the Act. We agree it is clear from the record that had the company equalized the base-wage rates of male and female inspectors on the effective date of the Act, as the law required, the day inspectors in 1969 would have been entitled to the same higher "red circle" rate the company provided for night inspectors.[29] We therefore conclude that on the facts of this case, the company's continued discrimination in base wages between night and day workers, though phrased in terms of a neutral factor other than sex, nevertheless operated to perpetuate the effects of the company's prior illegal practice of paying women less

[29] The January 1969 agreement provided an 8% or 20¢ per hour across-the-board wage increase, applied to the pre-January 1969 base wage and made retroactive to November 4, 1968. The contract also instituted new "job evaluation" wage rates for various positions. In the case of inspectors, the new "job evaluation" rate was higher than the retroactively increased base wage of day shift inspectors but was lower than the retroactively increased base wage of night shift inspectors. The contract further provided that where the job evaluation rate was less than the current rate for the job—that is, less than the retroactively increased old rate—employees hired before January 20, 1969, would continue to be paid the old rate, through "red circle" protection. Thus, the day shift inspectors received the new job evaluation rate, while the night shift inspectors continued to receive the higher "red circle" night shift base wage. Had the company complied with the law and equalized the base wages of day shift inspectors prior to 1969, the retroactively increased base wage of day shift inspectors would have been the same as the retroactively increased rate of night shift inspectors, and the day shift inspectors would have been entitled to the same "red circle" protection granted the night shift inspectors, since that retroactively increased rate was higher than the new job evaluation rate.

than men for equal work. Cf. *Griggs* v. *Duke Power Co.*, 401 U. S. 424, 430 (1971).

The judgment in No. 73–29 is affirmed. The judgment in No. 73–695 is reversed and the case remanded to the Court of Appeals for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE STEWART took no part in the consideration or decision of these cases.

THE CHIEF JUSTICE, MR. JUSTICE BLACKMUN, and MR. JUSTICE REHNQUIST dissent and would affirm the judgment of the Court of Appeals for the Third Circuit and reverse the judgment of the Court of Appeals for the Second Circuit for the reasons stated by Judge Adams in his opinion for the Court of Appeals in *Brennan* v. *Corning Glass Works,* 480 F. 2d 1254 (CA3 1973).