**Victoria CHRISTIANA, Plaintiff,**

**v.**

**METROPOLITAN LIFE INSURANCE COMPANY, Defendant.**

No. 92 Civ. 7816 (VLB).

United States District Court,
S.D. New York.

Dec. 13, 1993.

this program led male employees with greater longevity with the company and earning higher sums, when transferred so as to perform functions equivalent to plaintiff, to receive higher pay than plaintiff at plaintiff's location, a unit of the Kingston, New York regional office of the large national employer. The same program has led to women receiving higher pay than male employees in similar circumstances in other locations.

Richard B. Wolf, Poughkeepsie, NY, for plaintiff.

Richard L. Steer, Davidoff & Malito, New York City, for defendant.

## MEMORANDUM ORDER

VINCENT L. BRODERICK, District Judge.

### I

This case involves an alleged violation of the Equal Pay Act (the "Act"), 29 U.S.C. § 206(d)(1), brought by the plaintiff Victoria Christiana (the "plaintiff") against her employer Metropolitan Life Insurance Company (the "employer"). It presents the question of whether a company-wide or location-wide salary retention policy is a legitimate defense under the Act as a "seniority system" or "factor other than sex," justifying a wage disparity between individual employees of different genders and so as not to constitute a violation of the Equal Pay Act. I answer the question affirmatively as applied to this case, grant the defendant's motion for summary judgment and deny the plaintiff's cross motion.

### II

The core facts are not in dispute. Plaintiff, a woman employee of the employer who continues to work for it, has received continued pay increases over recent years. Her duties involve reviewing insurance claims and handling fraud investigations.

The employer has a company-wide salary retention program designed to permit it to keep experienced employees. Application of

### III

The Equal Pay Act was enacted in 1963 seeking to remedy wage discrimination based on gender in private industry. See *Usery v. Bettendorf Community School Dist.*, 423 F.Supp. 637 (D.Iowa 1976). The Act's declaration of policy articulates Congress' desire to overcome the harmful repercussions that result for the underpaid sex. Congress found such wage differentials to

> (1) depress wages and living standards for employees necessary for their health and efficiency; (2) prevent the maximum utilization of the available labor resources; (3) tend to cause labor disputes thereby burdening, affecting and obstructing commerce; (4) burden commerce and the free flow of goods in commerce; and (5) constitute an unfair method of competition.

Pub.L. No. 88–38, § 2, 77 Stat. 56 (1963).

The Act provides that "[n]o employer ... shall discriminate ... between employees on the basis of sex," 29 U.S.C. § 206(d)(1), by paying lower wages to employees of one sex than another, for work "which requires equal skill, effort, and responsibility, and which is performed under similar working conditions." Id. The Act permits an employer to justify a wage disparity between employees if due to a differential based on "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) ... any other factor other than sex." Id.

The four exceptions are affirmative defenses that must be shown by an employer in response to a *prima facie* showing of a wage disparity by a plaintiff. *Corning Glass Works v. Brennan*, 417 U.S. 188, 196, 94 S.Ct. 2223, 2229, 41 L.Ed.2d 1 (1974). The

legislative history of the Act reveals that industry representatives criticized the concept of equal work alone as too vague and argued that defenses for only seniority and merit systems were incomplete. *Equal Pay Act: Hearings on H.R. 3861 and Related Bills Before the Special Subcomm. on Labor of the House Comm. on Education and Labor,* 88th Cong., 1st Sess. 99 (1963) (statement of W. Boyd Owen, Vice President of Personnel Administration, Owens–Illinois Glass Co.). See *Corning Glass,* 417 U.S. at 200, 94 S.Ct. at 2230. Congress subsequently added specific elements for job evaluation—skill, effort, responsibility and working conditions—as well as the broad "factor other than sex" defense in response to employers' concerns.

Congress included the "factor other than sex" defense to prevent "bona fide job evaluation systems used by American businesses [from] otherwise be[ing] disrupted." *County of Washington v. Gunther,* 452 U.S. 161, 171 n. 11, 101 S.Ct. 2242, 2249 n. 11, 68 L.Ed.2d 751 (1981). Courts hesitate to substitute their judgment for that of the employer "who has established and applied a bona fide job rating system," *Gunther,* 452 U.S. at 171, 101 S.Ct. at 2249, quoting 109 Cong.Rec. 9209 (1963) provided that it does not discriminate on the basis of gender. See also *Hodgson v. Robert Hall Clothes, Inc.,* 473 F.2d 589 (3d Cir.), *cert. denied* 414 U.S. 866, 94 S.Ct. 50, 38 L.Ed.2d 85 (1973).

The language of the Act implies that any factor other than gender could qualify as a legitimate defense to a charge of wage discrimination. This term was chosen to provide a "broad general exception" because Congress realized it would be "impossible to list each and every" conceivable yet legitimate business need justifying a wage disparity. H.Rep. 309, 88th Cong., 1st Sess. (1963), reprinted in 1963 U.S.Code Cong. & Admin.News pp. 687, 689 (Purpose and Summary of Major Provisions). An exclusive list of factors would be incomplete and might hinder the operation of a valid job classification system used by a company with peculiarities requiring a differential not specifically enumerated—but a bona fide business reason nonetheless.[1]

Only a "bona fide job classification program that does not discriminate on the basis of sex will serve as a valid defense to a charge of discrimination." H.Rep. 309, 88th Cong., 1st Sess. (1963), reprinted in 1963 U.S.Code Cong. & Admin.News pp. 687, 689 (Purpose and Summary of Major Provisions).

Gender-neutral business-related factors that are purely job related will justify a wage disparity between employees of different sexes. See *City of Los Angeles Dep't of Water & Power v. Manhart,* 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978) (rejecting the cost of employing one sex compared to the other as a bona fide factor other than sex necessary to justify a wage disparity).

## IV

This case involves an alleged violation of the Equal Pay Act by the employer due to the payment of a lower salary to the plaintiff, a woman, than to her male co-workers, Employees A, B and C.[2]

Plaintiff was hired as a Junior Claim Approver trainee on a part-time basis by the employer in October, 1985, and was appointed to a full time position in the Kingston Fraud Unit on July 20, 1987. Plaintiff's management level[3] as of February 1, 1988 was at WO4 with a salary of approximately $17,000 per year, and was increased in February of 1989 to a management level of WO5 with a corresponding raise in salary to $19,773. In May of 1989, the plaintiff began to prepare law files[4] and in 1990 was spending one-fourth of her time conducting fraud investigations. Plaintiff was promoted to the position of Procedure Assistant, with a high-

---

1. *Corning Glass Works v. Brennan,* 417 U.S. 188, 198–99, 94 S.Ct. 2223, 2229–30, 41 L.Ed.2d 1 (1974).

2. The names of non-party employees referred to in this memorandum order are omitted.

3. An employee's management level identifies the salary range within which the employee will be compensated and controls the rate at which the employee's salary will be increased.

4. These are the case files that an investigator would compile and work from when investigating a potentially fraudulent claim.

er management level of WO6, in July of 1991, and her yearly salary was increased to $25,-480.[5] In 1991, the plaintiff began investigating fraud claims, negotiating settlements, and testifying in court, on a full time basis.[6] In November of 1992, plaintiff was again evaluated and received a promotion to a management level of WE7 with the title of Procedure Analyst I, and a corresponding salary increase to $27,560. Plaintiff continues to be employed by the employer.

## V

Employee A, a male, has been employed by the employer since February 1969. Prior to 1985 Employee A was both the Divisional Manager and the Divisional Director of the Kingston Claims Unit, with over 500 people reporting to him. His management level was RO8, and he earned a salary of $56,500. In 1985, the employer lost the primary contract that Employee A's unit handled, and during the next two years, his unit was reorganized and eventually phased out. Employee A maintained his management level and salary until 1987 when Employee A's unit was moved to a different office. In July of 1987, Employee A was transferred to the Kingston Fraud Unit. From July of 1987 to June of 1991, Employee A investigated fraudulent claims, negotiated their settlements and testified in court. Although he kept his previous salary, Employee A's management level was reduced from RO8 to RO6, and from 1988 to 1991 he did not receive any further salary increases. Employee A retired in July 1991.

Employee B has been continuously employed by the employer since March of 1961.[7] Prior to his transfer to the Kingston Fraud Unit in 1990, Employee B had held the posi-

tions of both Manager and Associate Manager of the Kingston Claims Office. As a manager, Employee B was responsible for over 150 employees, including Claims Supervisors, and was experienced in claims operations in general for the division. Through experience and years of service, Employee B had attained a management level of RO5 with a salary of approximately $45,600. Employee B began working in the Kingston Fraud Unit in 1990,[8] and left in July of 1991 on disability. When he left, Employee B's salary of $46,800 reflected the responsibilities of the positions he had previously held and his length of service with the defendant.

Employee C has been employed by the defendant employer since 1981. From 1987 to 1992, Employee C was a night supervisor of the Kingston Claims Office, responsible for more than thirty employees. Prior to his transfer, Employee C was an RO3 management level employee with a salary of $34,-300.[9] In 1992, due to an overall decrease in the number of employees, the Claims Office did not require the same number of supervisors as it had previously employed. Employee C, considered a "surplus" supervisor, was transferred to the Fraud Unit in order to preserve his job. Employee C still works in the Kingston Fraud Unit and is designated a Present Occupant Only under the employer's procedure for transferring employees, see below.

## VI

Upon transfer to the Kingston Fraud Unit pursuant to the employer's salary retention plan, all three male employees retained their prior salaries. Plaintiff was paid less than

---

5. There is some disparity between the salary figures recited here as stated by the defendant and the somewhat lower amounts claimed by the plaintiff. The differences do not affect the ruling made in this memorandum order.

6. Plaintiff contends that she began performing these duties in 1990. This time discrepancy is not determinative of any issues present in this motion and therefore is not a question of fact that would preclude granting defendant's motion for summary judgment.

7. Although Employee B was initially hired in July 1958, his continuous employment date reflects a break in employment from December 1975 to July 1978.

8. Although Employee B was a surplus employee at the time of his transfer, this status does not affect my decision as I am not relying on the employer's need to induce him to stay as a valid basis for the "factor other than sex" defense.

9. Employee C's salary was increased to $35,300 in 1993.

each of the three male employees:[10] $31,120 less than Employee A, $20,220 less than Employee B, and $8,820 less than Employee C.

Plaintiff has been employed by the defendant for seven years, two of which were part-time, while Employee A had worked for the employer for twenty-three years, Employee B for thirty-one years and Employee C for eleven years. During the relevant time period, plaintiff received raises as a percentage of salary that were well above those for Employees A, B, and C, who had significantly more years of service with the employer than did plaintiff.[11]

All three male employees (A–C) were transferred to new positions in the Kingston Fraud Unit pursuant to a written policy of the employer. In 1982, three years before plaintiff was first hired, the employer's personnel department incorporated into its "Management Guide to Human Resources" a section detailing the procedure for the transfer of employees between unequally compensated positions. The employer designated this practice its "Present Incumbent/Present Occupant Only" policy (the "salary retention policy"). The salary retention policy delineates the procedure for three situations: (1) positions established at a range lower than the job's evaluation, (2) positions established at a range higher than the job's evaluation, and (3) positions established without a formal job evaluation.

## VII

Fed.R.Civ.P. 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The purpose of the motion is to determine whether there is a genuine issue requiring a trial. A genuine issue of material fact exists if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); see *Converse v. General Motors Corp.*, 893 F.2d 513, 514 (2d Cir. 1990).

On the defendant employer's motion for summary judgment, I "resolve all ambiguities and draw all inferences," *Aldrich v. Randolph Cent. School Dist.*, 963 F.2d 520, 523 (2d Cir.), *cert. denied* — U.S. ——, 113 S.Ct. 440, 121 L.Ed.2d 359 (1992), from the proof submitted in favor of the plaintiff, the party opposing the motion, in determining whether there is a genuine issue of material fact which if existing, would oblige me to deny defendant's requested relief.

■ Under the Equal Pay Act, the plaintiff has the initial burden of proving a *prima facie* case of wage discrimination. Plaintiff must show that there is evidence that could lead a reasonable jury to conclude that her employer paid different wages to employees of the opposite sex for substantially equal work.[12]

■ Once the plaintiff has established a *prima facie* case the burden shifts to the employer to establish that it has a legitimate defense based on one of the four enumerated exceptions. *Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97, 94 S.Ct. 2223, 2229, 41 L.Ed.2d 1 (1974); *Aldrich*, 963 F.2d at 524. If the employer satisfies its burden of justifying the wage differential with a legitimate business reason, the plaintiff can rebut the employer's explanation by showing that the business reason is merely a pretext

---

10. Each employee's starting salary as of the date they commenced work in the Kingston Fraud Unit is being used to provide the basis for comparison.

11. Plaintiff's salary was increased 17% in 1988 and 1989, 10% in 1990, 11% in 1991 and 8% in 1992. In comparison, Employee A received no increase when he was transferred to the Fraud Unit in 1987, a 3% increase in 1988, and no further raise prior to leaving in 1991. Employee B received no increase when he was transferred in 1990, and a 3% raise in 1991. Employee C received no increase in 1992 when he was transferred, and a 3% raise in 1993.

12. Substantially equal work is defined in the Equal Pay Act as work which "requires equal skill, effort, and responsibility, and which [is] performed under similar working conditions." 29 U.S.C. § 206(d)(1). The scope of the pool of comparable employees may be broader than asserted by the plaintiff. See part X below.

for discrimination. See generally *St. Mary's Honor Center v. Hicks*, —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

■ Case law in this circuit indicates that an employer can meet its burden with respect to the "factor other than sex" defense only if it "prov[es] that a bona fide business-related reason exists for using the gender-neutral factor that results in a wage differential." *Aldrich*, 963 F.2d at 526;[13] see *Maxwell v. City of Tucson*, 803 F.2d 444, 447 (9th Cir.1986) (the "factor other than sex" defense "enables the employer to determine legitimate organization needs and accomplish necessary organization changes"); *Kouba v. Allstate Ins. Co.*, 691 F.2d 873 (9th Cir.1982) (proscribing an employer's use of a factor absent an acceptable business reason).[14]

■ Plaintiff contends that the employer's salary retention policy must not only reflect a legitimate business concern for the employer, but must also be specifically related to the requirements of her position in the Kingston Fraud Unit. Plaintiff relies on the Second Circuit's denial of the defendant school district's summary judgment motion in *Aldrich v. Randolph Central School Dist.*, 963 F.2d 520 (2d Cir.), *cert. denied* —— U.S. ——, 113 S.Ct. 440, 121 L.Ed.2d 359 (1992), as support for this proposition. The plaintiff in *Aldrich*, a woman cleaner, alleged that the school district violated the Equal Pay Act by paying her less than the male custodians who performed the same work. Custodians, who as a group were male and were paid more than cleaners, were only selected from among the top three scorers of a civil service examination which itself was open equally to all regardless of gender. The defendant asserted that since the examination was gender-neutral in its application it qualified as a valid factor other than sex. The court held that the

> use of the civil service examination and the job classification system keyed to examination results can provide a valid factor-other-than-sex defense if defendants prove … that the exam … and the practice of filling the [specific] position only from among the top three scorers on the exam are related to the performance of the … job [at issue].

Id. at 527.

The *Aldrich* court imposed a narrow task-related requirement due to the nature of the particular factor at issue—a job classification test. In contrast, the employer in this case is relying on its salary retention policy which is based on different business rationales than a job classification test.

Salary retention policies in general, and the employer asserts that its policy in particular, aim to reward longevity of service, recognize past experience and seniority, and preserve and improve employee morale. The purposes of a salary retention policy do not flow from specific job qualifications but rather company-wide business strategies, and therefore to establish the "factor-other-than-sex" defense, an employer is required to prove only that a "bona fide *business-related* reason exists for using the gender-neutral factor." *Aldrich*, 963 F.2d at 526 (emphasis added).[15]

Salary retention policies may qualify as valid factors other than sex, absent any showing that the policy was discriminatorily

---

**13.** The "factor other than sex" defense is available to employers in Title VII gender-based wage discrimination claims as well as under the Equal Pay Act pursuant to 42 U.S.C. § 2000e–2(h), known as the "Bennett Amendment" because of its legislative origins. See *County of Washington v. Gunther*, 452 U.S. 161, 171, 101 S.Ct. 2242, 2249, 68 L.Ed.2d 751 (1981). Under Title VII, as under the Equal Pay Act, the operative question is whether an employer has shown "a legitimate business reason" for asserted reliance on a factor other than gender. *Aldrich v. Randolph Central School Dist.*, 963 F.2d 520, 526 (2d Cir.), *cert. denied* —— U.S. ——, 113 S.Ct. 440, 121 L.Ed.2d 359 (1992), citing *EEOC v. J.C. Penney Co.*, 843 F.2d 249, 253 (6th Cir.1988).

**14.** The Seventh Circuit does not require a specifically proven business reason for a discrepancy to be upheld under the Act as long as the factor is neither discriminatorily applied nor causes a discriminatory effect. *Covington v. Southern Illinois University*, 816 F.2d 317, 321–322 (7th Cir.), *cert. denied* 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 101 (1987), reaffirmed in *Fallon v. State of Illinois*, 882 F.2d 1206 (7th Cir.1989); see also *Strecker v. Grand Forks City Social Services Bd.*, 640 F.2d 96, 100–103 (8th Cir.1980), adopted *en banc* 640 F.2d 109 (8th Cir.1981).

**15.** See also part X below.

applied or has a discriminatory effect. *Covington v. Southern Illinois University*, 816 F.2d 317, 322 (7th Cir.), *cert. denied*, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 101 (1987). See also, Note, *When Prior Pay Isn't Equal Pay: A Proposed Standard for the Identification of "Factors Other Than Sex" Under the Equal Pay Act*, 89 Colum.L.Rev. 1085 (1989) (salary retention plan that does not perpetuate discriminatorily-set starting salaries [16] and is implemented systematically in response to a business need is an example of an acceptable, non-sex business related factor other than sex).

A salary retention policy recognizes an employee's length of service. This recognition is apt to improve employee morale since it enables an employer to avoid demoting a valued employee who is transferred to another position and subject that employee to an unmerited pay reduction. Id. at 323; *Blocker v. AT & T*, 666 F.Supp. 209, 214 (M.D.Fla. 1987).

Another legitimate justification for a salary retention policy is that it avoids additional expenses incurred to search for new employees and subsequently train them. Moreover, the employer would conserve investments in training of employees with several years of experience whose previous positions as narrowly defined are no longer available because of changes in business needs. *Blocker*, 666 F.Supp. at 214 (longevity of service was considered very important and male employee's years of service were reflected in his pay); *Corning*, 417 U.S. at 204, 94 S.Ct. at 2232 (recognizing that the Equal Pay Act contemplates that a male employee with 20 years' seniority can receive a higher wage than a woman with two years' seniority).

## VIII

Studies indicate that in recent years businesses increasingly structure compensation systems based upon entity-wide business strategy. Whitney, *Pay Concepts for the 1990's: Part I*, 20 Comp. & Benefits Rev. 33, 36 (1988). Company-wide seniority has a long history and has been recognized as a legitimate business policy. See U.S. Bureau of Labor Statistics, *Union Agreement Provisions*, 1942 Bulletin 118.

The employer's salary retention policy, which prescribes the procedure for the transfer of an employee to a lower compensated position, is designed to operate on a company-wide level, and not within any particular local unit. Therefore, the appropriate analysis of the policy is how it has been applied and its effect on the company as a whole.

Another department in the same division as the Fraud Unit presently has forty-one employees who have retained their prior salaries under the salary retention policy due to reorganizations and surplus situations. Twenty-six of these employees are women. Additionally, Employee D, a woman, was transferred to the Kingston Claims Office in 1991 and still maintains Present Incumbent Only status under the salary retention policy similar to Employee C's situation. This indicates that overall the employer's salary retention policy is gender-neutral and benefits women equally with men.[17]

## IX

Interpretive regulations concerning the Equal Pay Act specify that "red-circle rates" are a valid factor other than sex. 29 CFR § 1620.26 (1986). "Red-circle rate" is the term applied to employer transfer of an employee to a lower paying position while continuing to pay the employee the higher salary from the previous position, in order to have the employee available when needed for the former job. 29 CFR § 1620.26(b) (1986).

---

**16.** There is no allegation here that the salaries of male employees A, B and C when first hired by the employer were set in a discriminatory manner.

**17.** Plaintiff argues that even if the employer's salary retention policy is valid, its failure to evaluate a transferred employee's new position after six months constitutes a violation of its own procedure. An employer's alleged failure to comply with a provision of its own policy, however, is not automatically relevant or fatal unless it indicates a violation of the Act. Here, even if a Present Occupant Only position is evaluated at a lower level, only the employee's *management* level (which controls the rate of increase) is reduced, *not* the employee's salary.

Although the regulation refers to temporary reassignment due to illness, the enumerated examples and the concept are non-exclusive and merely illustrate situations in which such factors can be considered. The justification for allowing employers to engage in red-circling is to accommodate legitimate business needs by permitting bona fide wage disparities not based on gender in order to minimize the disruption. This reasoning supports the conclusion that the employer's salary retention policy is a valid factor other than sex. Retaining experienced employees rather than incurring expenses in searching for qualified new employees is a legitimate gender-neutral business objective.

## X

Although the detailed functions fulfilled by plaintiff and Employees A, B and C at the Kingston regional office are similar, comparisons between plaintiff and Employees A, B or C are not necessarily the proper ones. Claims review and investigation is not a distinct field such as medicine or the piloting of aircraft, requiring separate skills not widely applicable to adjacent activities. Insurance underwriters must necessarily be aware of claims procedures and problems, as insurance sales personnel must be with fraud problems and the like. The salary retention policy reflects a reasonable conclusion by the employer that significant interchangeability within these fields is present and important to its business. No gender discrimination is involved. As indicated by the advantages to women in other instances, no disparate impact is present.

If a broad spectrum of white collar professional employees represents the applicable pool within which inequalities must be shown, comparing plaintiff with A, B or C is not significant. Plaintiff has submitted no evidence supporting a claim that her narrowly defined assignment is truly a separate career within the employer. There is no evidence that gender plays any role in setting salaries within the broader field (the relevant "market" for purposes of the work done by plaintiff for the employer)—even assuming contrary to what I find to be the case, that even focusing only on the Fraud Unit, a challenge-able inequality was produced by the infusion of Employees A, B and C at their former salary levels less adjustments.

The notion of a broad rather than narrow work and job definition for employees with broad training is exemplified by the military, in which a Colonel's duty is to do as ordered within the general skills expected of such an officer. The same officer may be given differing assignments without altering the rank, compensation and overall nature of the position. Colonels would doubtless be comparable with each other, not with others who may be on temporary duty performing the same temporary function such as commanding a unit of a particular size or at a particular location.

The Equal Pay Act contains no prohibition of broad job categories. Prohibition of the leeway claimed by the employer would have an adverse effect on efficiencies and competitiveness with no offsetting gain for the goals of equality sought by Congress in the relevant statutes. See Fasman, "Legal Obstacles to Alternate Workforce Designs," 8 Employee Rel.L.J. 256 (1982).

## XI

Based on the reasoning relevant to the statutory catch-all exception (iv) ("any other factor other than sex"), the salary retention plan also qualifies as a "seniority" system under 29 U.S.C. § 206(d)(1). Because the basis of the salary retention plan is prior service, I consider the seniority defense even though the parties have not presented arguments focusing on it.

Seniority systems are employment-relations tools that take experience and length of service into account. The fact that the employer's policy at issue here relates to pay rather than retention does not alter the fact that it is based on prior service. See generally *Brennan v. Victoria Bank & Trust Co.,* 493 F.2d 896 (5th Cir.1974).

## XII

■ There is no basis to infer that the employer's salary retention plan is pretextual or was distorted as a pretext for any discrimination purpose. See *St. Mary's Honor Cen-*

*ter v. Hicks*, —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The program was established long before the plaintiff was hired or the situation arose; it was applied in other locations where it happened to benefit women just as male employees were given the benefit in the unit where the plaintiff was employed.

Furthermore a nefarious internal recommendation to engage in what could well have been pretextual activity was rejected by management, and the opposite course—promotion rather than demotion of the plaintiff—was adopted. A confidential memorandum written by the Human Resources Administration indicated that plaintiff's supervisor had expressed concern about possible legal problems resulting from the salary disparity between plaintiff and Employee C.[18] The Human Resources Administrator responded by stating that plaintiff "should not be handling responsibilities that are above her level ... and [the supervisor] should have her discontinue doing these responsibilities." The supervisor vetoed this suggestion by responding that if the Administrator wanted to tell plaintiff "that [plaintiff] is being demoted back in responsibilities, you can do that." Affidavit of Plaintiff, April 1, 1993, Dkt. # 17, Exh. A. Instead, the plaintiff was promoted within the same year.

As is clear from the fact that the plaintiff was never demoted, the company's ultimate decision-makers rejected the nefarious suggestion that the plaintiff's responsibilities be reduced in an apparent attempt to put the plaintiff in a position from which it would be harder to sue. This suggestion was obvious-ly and wisely disregarded; instead, she was promoted on the basis of her merit[19]—the course of action that the statutes involved here would favor.

The plaintiff asserts that the employer's justification based on its salary retention policy is a pretext because personnel records and documents relating to Employees A and B[20] do not explicitly indicate transfers into the Fraud Unit pursuant to that policy. Paper trails can furnish evidence for or against arguments as to the meaning of events. A paper trail is not mandated by the anti-discrimination statutes; informal decision-making is neither prohibited nor exempt. See *Watson v. Fort Worth Bank & Trust Co.*, 487 U.S. 977, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988); see generally Mertens, "*Watson v. Fort Worth Bank & Trust Co.*," 14 Employee Rel.L.J. No. 2, at 163 (Fall 1988). Otherwise, legitimate activity would be placed in a straightjacket. See Fasman, "Legal Obstacles to Alternate Workforce Designs," 8 Employee Rel.L.J. 256 (1982).

Employment decisions are to be evaluated like others based on the inherent characteristics of what was done. Action may be taken by an employer pursuant to a policy whether a written document is created or not. The evidence presented by the parties appears to be clear that the treatment of the employees involved here (Employees A, B and C) falls within the employer's policy.

There is no indication that customarily maintained records are absent in a way that would create an adverse inference of pretextual behavior.[21]

---

**18.** Plaintiff implies that her supervisor's statement in this confidential memorandum dated June 17, 1992 that plaintiff "could build quite a case" and that the employer "could be in a lot of trouble" are persuasive concerning the issues present here. The supervisor's opinion is only that, and does not refer to any facts on which a jury could find a violation of the Act.

**19.** Although this promotion does not track the precise recommendations of plaintiff's supervisor, her title changed from Procedure Assistant to Procedure Analyst I, and her new higher salary range at level WE7 is consistent with her years of employment and experience.

**20.** Documents dating from the time Employee C moved into the Fraud Unit clearly indicate that his position was established for purposes of retaining him pursuant to company policy and that the position was designated "for present incumbent only."

**21.** See *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The fact that some employees are given high commendations and others may be subject to criticism by a supervisor yet are retained based on criteria of an employer salary retention plan is not pertinent unless some indication of illegal discrimination is involved. Otherwise no controversial employee could be permitted by higher management to advance in an organization. See A. Jay, *Management and Machiavelli* (1986).

The employer's policy here does not appear to be trumped up or gerrymandered to fit this particular case in order to permit the employer to give favoritism to certain employees. If the other factors considered in setting the salaries of the male employees in the Fraud Unit were of the type prohibited by the statute, the employer's justification would fail. But where, as here, a seniority system is applied uniformly, there is no pretext.

## XIII

The Equal Pay Act, 29 U.S.C. § 206(d), was enacted in 1963 by Public Law 88–38, 77 Stat. 56 (1963), prior to Public Law 88–352, 78 Stat. 255 (1964), adopting Title VII of the Civil Rights Act of 1964. Title VII prohibits discrimination in employment based "race, color, religion, sex, or national origin," 42 U.S.C. § 2000e–2. The highly general terms used in Title VII prohibit discrimination in pay as well as in other respects, based on gender and the other listed factors.

Title VII, as a subsequent and broader enactment, is persuasive as to the proper construction of the more limited pioneering statute, 29 U.S.C. § 206(d). One should not lightly assume that Congress intended discrimination based on race, for example, to be less stringently prohibited than equally invidious discrimination based on gender. Such a strained result would hardly be consistent with the objectives of either Title VII or the Constitution.

The objective of both laws—equality regardless of invidious factors—is best achieved by treating both as part of a single consistent statutory architecture. Compare *United States v. United States Gypsum Co.,* 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978) (construing the Robinson–Patman Price Discrimination Act, 15 U.S.C. § 13, to comport with purposes of the Sherman Act, 15 U.S.C. § 1, by not allowing consultation among competitors to verify offers of discount prices).

Under both Title 29 and Title 42, discrimination based on gender—one of the invidious factors listed in 42 U.S.C. § 2000e–2—is prohibited; legitimate nondiscriminatory business decisionmaking is permitted.[22]

Congress intended to give consistent instruction to employers, utilizing all statutes for that purpose. The substantive content of the Equal Pay Act and of Title VII form ONE WHOLE[23] and should be so construed to avoid risk of confusing or contradictory mandates to employers. As described by Justice Cardozo in *Bristol v. Woodward,* 251 N.Y. 275, 289, 167 N.E. 441 (1929), "in the end we may find that [the two sources of law] have come together so often and in so many ways that there is no longer space between the paths, no longer choice to make between them."

There is no indication here that the employer discriminated based on gender rather than seniority or longevity in violation of the Equal Pay Act, Title VII or the objectives of either.

**SO ORDERED.**

---

**22.** See footnote 13 above. Intentionality of discrimination is not required under the Equal Pay Act but has relevance in some circumstances in Title VII.

**23.** This phrase was used in *The Federalist* No. 82 (Hamilton) to refer to federal and state judicial systems; the emphasis is in the original. Modern Lib. ed. at 537 (1937).