Cora P. WALKER et al., Plaintiffs,

v.

COLUMBIA UNIVERSITY et
al., Defendants.

Peter J. BRENNAN, Secretary of
Labor, United States Department
of Labor, Plaintiff,

v.

COLUMBIA UNIVERSITY, a corpora-
tion and William J. McGill, Individu-
ally and as President of Columbia
University, Defendants, Third-Party
Plaintiffs,

v.

TRANSPORT WORKERS UNION OF
AMERICA, AFL–CIO, et al.,
Third-Party Defendants.

Nos. 73 Civ. 2687, 74 Civ. 1129.

United States District Court,
S. D. New York.

Feb. 11, 1976.

Bellamy, Blank, Goodman, Kelly & Stanley, New York City (Janice A. Goodman, New York City, of counsel), Lefcourt, Kraft & Arber, New York City (Carol Arber, New York City, of counsel), Center for Constitutional Rights (of counsel), for plaintiffs Walker, Cruz, and others.

Thacher, Proffitt & Wood, New York City (Robert S. Stitt and Anthony P. Limitone, Jr., New York City, of counsel), for defendants-third party plaintiffs, Columbia University, William J. McGill, Trustees of Columbia and William E. Petersen, Chairman of Bd. of Trustees.

William J. Kilberg, Sol. of Labor, Washington, D. C., Francis V. La Ruffa, Regional Sol., Patricia M. Rodenhausen, Jay S. Berke, Helen Bodian, Attys., U. S. Dept. of Labor, New York City, for plaintiff Brennan.

O'Donnell & Schwartz, New York City (Michael Klein, New York City, of counsel), for defendants-third party defendants, Transport Workers Union of America, AFL–CIO, and others.

## OPINION AND ORDER

OWEN, District Judge.

There are two actions before me. The first is by plaintiffs Cora P. Walker, et al., against their employer Columbia University, a non-profit institution of higher learning, and Transport Workers Union of America, AFL–CIO, and its Local Union No. 241, their unions alleging sex discrimination in hiring, promotion and pay in violation of the Equal Pay Act, 29 U.S.C. §§ 201 et seq. (hereinafter E.P.A.) and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–15 (hereinafter Title VII). The second is by plaintiff Peter J. Brennan, in his capacity as United States Secretary of Labor, for an alleged violation by Columbia of the E.P.A. In the second action Columbia brought in the Unions as third-party defendants.

To maintain various of its class buildings and residence halls, Columbia University has "light" and "heavy" cleaners [1] working under the direction of supervisors. It has security guards to protect these buildings. The heavy cleaners, guards and supervisors all have women among their numbers. There are no men among the light cleaners.

At all material times, Mrs. Walker and the other individual plaintiffs (collectively the "Walker plaintiffs") were employed as light cleaners within the Buildings and Grounds Department of Columbia. The Union has been the exclusive bargaining agent for all of the University custodial and maintenance employees at Morningside Heights since about 1945.

The above entitled actions were consolidated for trial purposes by order dated April 10, 1974 and a lengthy trial was held in installments commencing on September 9 and concluding on November 21, 1974.

---

1. Until 1972, these were respectively called "maids" and "janitors" (included in the janitor category were women called "shower maids").

*As To The Equal Pay Claims:*

Columbia, within its Department of Buildings and Grounds and within its Department of Residence Halls has, for at least 30 years prior to March 11, 1971,[2] and continuing to the present, maintained separate job classifications and paid different wages for heavy cleaners and light cleaners. No male has ever applied for a light cleaner position. Some females have applied for and have been accepted as heavy cleaners.

Dating back to at least the early 1940's, the heavy cleaner category has included women charged with the duty of cleaning the lavatories and shower facilities in the dormitories such as Johnson Hall, reserved exclusively for women ("shower maids"). There are presently two women (one full time and one part time) who perform this duty on a permanent basis and receive heavy cleaner pay.

Since the mid-1940's, Columbia has also paid heavy cleaner wages to light cleaners working in the Residence Halls Department for those periods in which they were asked to perform and did perform heavy cleaner duties.

Commencing with the 1970 contract and at all material times thereafter the terms of written job descriptions for each job classification, including heavy cleaners and light cleaners, have been incorporated by reference into the collective bargaining agreements between the Union and Columbia.

The pertinent job description for heavy cleaners, prepared by Columbia under date of November 6, 1969, provides:

Performs heavy cleaning duties in academic and research buildings including any or a combination of the following:

Operating heavy motor driven cleaning equipment

Wet mopping floors

Stripping floors

Washing walls, glass partitions and blackboards

Polishing marble or brass

Moving furniture within rooms being cleaned

Hosing sidewalks

Shoveling snow from front stoops and entranceways

Removing heavy rubbish

Changing light bulbs and fluorescent tubes

Turning on and off ventilation equipment

He will also perform such tasks as:

Dusting

Waxing

Spot removal of carpeting

Shampooing of carpeting

Washroom and toilet cleaning

Receiving and storing of 55 gallon drums, paper supplies and other housekeeping supplies and equipment.

Janitors are responsible for the safekeeping, minor repairs and preservation of all janitorial equipment. They are also responsible for locking up and securing buildings, offices, classrooms, auditoriums, etc.

The pertinent job description for light cleaners, also prepared under date of November 6, 1969, provides:

Maids perform light cleaning duties in all academic and research buildings and are usually limited to such tasks as:

Sweeping

Dust mopping

Vacuuming

Dusting and polishing furniture

Emptying wastebaskets

Removing finger marks and wall washing as high as they can reach without using stepladders or other devices.

Maids are also responsible for policing ladies' toilets and refurbishing supplies in same including sanitary napkins, toilet tissues, towels and soap.

From the record, I find that heavy cleaners perform heavy cleaning services such as removing heavy rubbish and garbage, cleaning and sanitizing public lava-

---

2. The earliest date mentioned in the *Brennan* complaint, as amended.

tories, and wet mopping corridors, stairways, elevators and lobbies. These tasks are performed by the heavy cleaners on a daily basis. Heavy cleaners are assigned to lobbies, stairways, elevators, corridors and public lavatories, public areas used by countless persons each day. Heavy cleaners are also assigned to high places requiring the use of ladders. They are also responsible for all custodial work which is performed alone at night in off-campus buildings located outside the University's security perimeter. In addition, heavy cleaners do "project work" which includes stripping floors, waxing floors, shampooing carpets, washing walls, high dusting and venetian blind cleaning. Such project work is performed on a regular, rotating basis throughout the University's buildings. Some heavy cleaners use expensive motor driven floor machines to scrub and strip floors, wax and buff floors and shampoo carpets.

Heavy cleaners also use the following:

(a) *Heavy Mopping Equipment*—this equipment includes two 44 quart pails plus ringers, a dolly and solution which weigh from 60 lbs. empty to 140 lbs. full and mop trucks which come in two sizes—30 gallons and 60 gallons and which weigh from 160 to 200 lbs. empty and from 300 to 540 lbs. full.

(b) *Trash Trucks*—these trucks are approximately six feet long, three feet wide and six feet high and weigh from 200 lbs. empty to 800 lbs. full. These trucks must be loaded and pushed to dumping areas daily.

(c) *Industrial Type Wet/Dry Vacuum Cleaners*—These machines, much larger and heavier than the upright household types used by the light cleaners, range from 74 to 96 lbs. empty and from 122 to 192 lbs. full.

(d) *Carpet Shampoo Machines*—such motor driven machines weigh approximately 75 to 88 lbs. empty and from 110 to 123 lbs. with solution.

(e) *Pile Lifters*—these motor driven machines weigh approximately 75 to 88 lbs. empty and from 110 to 123 lbs. with solution.

(f) *55 Gallon Drums*—these drums contain cleaning solvents which, depending on the type of solution, weigh from 400 to 600 lbs.

Light cleaners, pursuant to the foregoing job description, are limited to doing light cleaning services such as dusting desks, tables and chairs, dust mopping floors, vacuuming, spot cleaning walls (no higher than they can reach), polishing desks, emptying ashtrays, and, with some exceptions, wastebaskets. When absences occur, light cleaners are instructed to fill in for other light cleaners but they are never required to fill in for heavy cleaners. Light cleaners are assigned to reading rooms, seminar rooms, laboratories, classrooms and offices and some private lavatories. Light cleaners' equipment consists of rags, sponges, dustpans, dust mops, toy brooms, upright household vacuum cleaners, manual carpetsweepers and occasionally light wet-mopping equipment. Some carry their equipment in wastemobiles, carts, pails or shopping bags.

The collective bargaining agreements between the University and the Union have long provided for a grievance procedure which has been used to insure Columbia's compliance with the job descriptions.[3] Most complaints of this nature are resolved at the supervisory level. Supervisors and employees are well aware of the demarcation line between the duties of light cleaners and heavy cleaners and supervisory personnel regularly monitor the work of heavy cleaners

---

**3.** Since 1945, all collective bargaining agreements between Columbia and the Union have contained the following provision:

An employee temporarily performing the work of another employee in a job classification to which a higher rate of pay is attached shall receive such higher rate for the time during which he performs the work of the employee in the higher classification.

So far as the record reveals, no claims have been asserted against Columbia pursuant to this clause.

and light cleaners to insure that the distinction between the two jobs is maintained. If an overlap in the duties occurs, supervisory personnel will order appropriate corrective action. Thus, heavy cleaners, not light cleaners, empty the wastebaskets in a number of locations, including the Journalism Building, where wastebaskets contain magazines, books and other heavy material.[4]

Collective bargaining agreements between the University and the Union are usually renegotiated every two years. Dating back to the 1940's, women have always been members of the Union's negotiating committee and, since at least 1950, women have also been members of Columbia's negotiating team.

After agreement has been reached at the bargaining table, the terms of the proposed contract are explained to the membership and a secret ballot is taken. After approval by the membership of the local, the contract is executed, printed and copies distributed.

The 1970 agreement between the Union and Columbia was negotiated in good faith, and as in the case of previous agreements, with women on both sides of the bargaining table. Three light cleaners were members of the Union's negotiating committee. Both sides were represented by experienced labor counsel. An official of the Federal Mediation and Conciliation Service attended the last eight sessions and was instrumental in reaching agreement. There was no Union proposal that the pay scales for heavy cleaners and light cleaners should be the same.

The Equal Pay Act forbids wage discrimination "between employees on the basis of sex" when employees perform "equal work" on jobs in the same establishment requiring "equal skill, effort and responsibility, and which are performed under similar working conditions . . . ."[5] In any E.P.A. action the threshold question always is: are the jobs equal. Plaintiffs have the burden of proving that as the aggrieved parties they perform *equal* work, not merely that a wage differential exists and that the jobs are similar.[6]

> [T]he complaint must be dismissed even if the wage differentials were unreasonably large in comparison with the actual differences in skill, effort, responsibility or working conditions and were based on discriminatory motivation; Congress did not intend to put either the Secretary or the courts in the business of evaluating jobs and determining what constituted a proper differential for unequal work.[7]

I conclude that plaintiffs have failed to sustain their burden. While there are many similarities between the work done by the light cleaners and heavy cleaners, their work is not the same.

In deciding that the jobs of light cleaner and heavy cleaner are unequal under the E.P.A. standard, I have not considered the use, by some heavy cleaners, of heavy floor stripping machines. First, not all heavy cleaners use these machines nor even know how to. The fact that some men may occasionally do different work would not justify a differential paid to all men. *Hodgson v. Brookhaven Gen. Hosp.*, 436 F.2d 719, 725 (5th Cir. 1970). Second, Columbia treats the use of the stripping machines as project work for which it pays a per hour premium. Availability for project work for which a premium is paid is not an allowable reason for unequal pay where the jobs are otherwise the same. *Corning Glass Works v. Brennan, supra.* (shift differential paid).

I affirmatively find, however, that the jobs of light cleaner and heavy cleaner

---

4. See n. 9, *infra*.

5. 29 U.S.C. § 206(d)(1) (1970). *See generally,* Ross & McDermott, The Equal Pay Act of 1963: A Decade of Enforcement, XVI B.C. Ind. & Com. L. Rev. 1 (1974).

6. *Corning Glass Works v. Brennan*, 417 U.S. 188, 196, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974).

7. *Hodgson v. Corning Glass Works*, 474 F.2d 226, 231 (2nd Cir. 1973), *aff'd sub nom. Corning Glass Works v. Brennan*, 417 U.S. 188, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974).

are different. Going beyond the job descriptions,[8] from the extensive testimony adduced before me at the trial, it is clear that the job of heavy cleaner involves greater effort than that of light cleaner.[9]

Finding no violation of the E.P.A., the action of the Secretary of Labor is dismissed. Columbia's third party action against the Union is likewise dismissed.

### As To The Title VII Claims:

▬ With Title VII, Congress mandated that the courts look at the entire spectrum of employment practices when allegations of sex discrimination are made.[10] While a finding that the E.P.A. was not violated does not preclude a finding of a Title VII violation, *Hodgson v. Golden Isles Convalescent Home, Inc.*, 468 F.2d 1256 (5th Cir. 1972) (per curiam), the evidence on the trial has not made out such a claim.

As a background for consideration of the claims of the named plaintiffs, I find the following facts. Columbia's employees have been, and still are, notified of promotional opportunities within Columbia by postings placed in conspicuous places throughout the University, including bulletin boards by the time clocks used by employees in the Buildings and Grounds and Residence Halls departments. Such postings are not restricted as to sex. It is Columbia's practice that present employees receive initial consideration for any and all job vacancies.

The foregoing posting procedure was also included in Columbia's affirmative action plans approved by the United States Department of Health, Education and Welfare in 1972.

Very few women ever applied or expressed interest in a heavy cleaner position. Some testified that they never applied for a heavy cleaner position because they could not perform heavier work.

In August 1972, the University posted job openings for six heavy cleaner positions within the Buildings and Grounds Department. Ten light cleaners applied. All were interviewed. Two asked that their names be withdrawn. Seven commenced training. Mrs. Moss, who testified on this subject, stated she received encouragement from the supervisors and was treated fairly.

After periods ranging from approximately three to seven weeks, Nellie Diaz, America Francisco, Catherine Nesbitt and Mrs. Moss transferred back to light cleaner at their own request. In October 1972, Rachael Boler, one of the seven, after having signed posted notices, accepted a position as security guard, which she still holds. Helen Gilliam and Betty Thomas continue to be employed through the present date as heavy cleaners within the Buildings and Grounds Department. Columbia posted openings for six additional heavy cleaner positions in September-October 1972, with light cleaners being given the first opportunity to bid these new positions. Notwithstanding these and additional postings, no additional light cleaners have ever applied for jobs as heavy cleaners.

There are women supervisors who have heavy cleaners as well as light

---

**8.** See text p. 1372, *supra*.

**9.** The employees themselves recognize the difference, light cleaners being quick to protest doing certain heavy cleaner work. In 1971, a group of light cleaners complained that they had been obliged to haul heavy garbage at one of the buildings. This was corrected by a night superintendent who directed the heavy cleaners to haul away such trash.

**10.** 42 U.S.C. § 2000e–2(a) provides:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . sex . . . .

cleaners under their direction: the head housekeeper in the Residence Halls, the executive housekeeper and the staff decorator in Buildings and Grounds. One Mrs. Tookes, a light cleaner, was offered a supervisor's job in 1968 or 1969 but refused the position.

Class action status was denied by Judge MacMahon. Only three of the named plaintiffs, Pearlie Dickens, Cora Walker and Sarah Moss testified. As to their claims of violations of Title VII, I find the following facts:

Mrs. Dickens was told about a maid's job at Columbia by a friend. She applied for night work since she had children. Night work was not available and she started working in the day time. Several months later, a night job became available, which she took. She never applied at any time for a janitor's job. She knew of the availability of janitors' or heavy cleaners' jobs, having seen the postings in 1972 and 1973 near her time clock. She knew of other light cleaners applying for heavy cleaners' jobs in 1972 and knew that two had been hired and were working as heavy cleaners.

Mrs. Walker was told by a male employee that he thought "they was accepting applications . . ." and she should try for a job at Columbia. She filed an application and two months later got a job as a light cleaner. There came a time when she and thirty others were notified of a proposed layoff. She tried for similar work at other places Columbia recommended but without success. Before the time for the layoff, someone in the union told her to go sign her name for a security guard's job that was posted. She thereafter had an interview, nothing came of it and, since the layoff was cancelled, she continued to work as a light cleaner. Thereafter over the next year and a half she signed up for guard three times more before eventually being hired. She was rejected on the earlier applications, being told that they had found someone more experienced. Along the way she took a course at Columbia in English grammar which would be of help to her in the reports she would be required to write. During the times of her earlier rejections, Columbia hired four women as guards and rejected some male applicants for guard positions. Also, I note that in August 1972 Mrs. Walker applied for a job as a heavy cleaner but when it was offered to her she did not accept it.

I find that a friend told Mrs. Moss that Columbia was hiring in August of 1969 and she applied for a night job. Two months later, an opening occurred on the night shift and she went to work as a light cleaner. In January 1972 she was notified of termination along with thirty others and went to the Personnel Office and asked for an application for the heavy cleaner's position. She was told by a woman she saw that the office did not have any applications and she was told to come back. Apparently, she did not go back. At a later point, she filed certain unspecified charges as to which the record is silent with the New York State Division of Human Rights and thereafter attended a meeting at which Columbia officials were present. She told about asking for a form and being told to come back and was immediately offered a job on the day shift as a heavy cleaner. She turned it down since she could not work days. The layoff as a light cleaner being cancelled, she continued working and saw a posted notice for a heavy cleaner working at night. She signed up for it and was hired and put in training with several other women. During the course of the training, she did not like the uniform furnished (a man's pants and shirt) which apparently ill-fitted her. She complained and was given a better fitting uniform. It appears that the training period for Mrs. Moss and other heavy cleaners was longer than the average period for newly employed male heavy cleaners, but I am unable to conclude on the record that the difference was occasioned by any sexual discrimination. Mrs. Moss forthrightly testified that both supervisors Shervington and Thomas were fair to her and gave her nothing but encouragement during the course of her training.

After being employed for some time as a heavy cleaner, Mrs. Moss wished to be transferred to another building. She said it was "nothing personal" between her and her supervisor but she never told anyone at Columbia of any problem. The supervisor of the heavy cleaners, Mr. Shervington, said he would do it within a period of two weeks. Apparently, he was unable to find another spot to which to transfer her immediately and during the time she was waiting, she attended a party to which light cleaners were invited. At the end of the party it was her duty as a heavy cleaner to assist in the cleaning up. A garbage bag broke making a considerable mess, which she cleaned, but was distressed when her supervisor, Jackson, double-checked her work. She felt she could not take the work anymore and asked to go back to being a light cleaner, which was accomplished. While one may suspect that there was less than warm friendship between herself and her immediate supervisor, I tend to conclude that Mrs. Moss came not to like the job because of its arduousness and the last straw was the fact that her friends in the light cleaning category at the said party had no responsibilities whatever in cleaning up.

Given the foregoing, I am unable to conclude that any individual plaintiff has demonstrated by a fair preponderance of the credible evidence either discrimination as to that plaintiff by reason of sex or any pattern or practice at Columbia of discriminating against women generally.[11] Mrs. Dickens never applied for any other jobs although she knew women were getting them. Mrs. Walker did become a guard and while she was earlier being turned down, Columbia was hiring other women as guards. Mrs. Moss did become a heavy cleaner along with a number of other women. Others of those women are still heavy cleaners. At most, one could conclude from some of the proof in the record that from time to time residuary "male chauvinism" on the part of individual employees has evidenced itself. However, this does not make a pattern or practice chargeable to an employer and actionable by an employee. Given this, the Title VII claims of the remaining named plaintiffs are dismissed for failure of proof.

Whatever may have been the validity of the Title VII action had it been instituted prior to 1971, that question is not before me and I need not and do not render any conclusions thereon. While laggards in the march to equality must be judicially prodded, this is not appropriate as to those now in the flow of that march, regardless of when they joined.

The complaints herein are dismissed. It is so ordered.

---

11. Given the extensive testimony of various witnesses as to events of recent years at Columbia, the statistical presentation of the Walker plaintiffs stressing years prior to 1971 is not persuasive as to Columbia's picture today, and I give it little weight; see *infra*.