**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

v.

**AMERICAN PHARMACEUTICAL ASSOCIATION, Defendant.**

**Civ. A. No. 81–1820.**

United States District Court, District of Columbia.

Dec. 20, 1983.

Mollie W. Neal, Baltimore, Md., for plaintiff.

Michael H. McConihe, Washington, D.C., for defendant.

## MEMORANDUM ORDER

JOHN GARRETT PENN, District Judge.

The Equal Employment Opportunity Commission (hereinafter EEOC), on behalf of Ms. Cyrelle K. Gerson, a former employee of the defendant, American Pharmaceutical Association (APHA), brought this action alleging violations of Section 216(c) and 217 of the Fair Labor Standards Act (FLSA) of 1938, *as amended*, 29 U.S.C. § 201 *et seq.* More specifically, plaintiff alleges violations of the Equal Pay Act of 1963 (EPA), 29 U.S.C. § 206. Plaintiff alleges that from June 1977, until August 4, 1981, the date the complaint was filed, APHA violated the Act by sexually discriminating between two employees, Cyrelle Gerson and Arthur P. Herrmann, by paying them unequal salaries for equal work. Plaintiff alleges that even though the job that Gerson was hired to perform required equal skill, effort and responsibility as that of her male counterpart, she was paid lower wages because of her sex. Defendant

affirmatively answers the allegations by stating: "Any differentials in the rate of pay between employees of the American Pharmaceutical Association are based solely upon differences in skill, effort, responsibility and other factors other than sex." *See* Defendant's Answer at 2.

This case is now before the Court on defendant's motion for summary judgment. After giving careful consideration to the motion and the opposition thereto, as well as the record in this case, the Court concludes that the motion should be granted.

I

Most of the salient facts have been outlined in a Joint Stipulation of Facts (J.S.) entered and filed by both parties. Very briefly, Ms. Gerson commenced employment with APHA on June 6, 1977 as a staff member in the Association's Professional Affairs Division supervised by Dr. Richard P. Penna. Ms. Gerson's job title was Director of Special Projects. She was hired at an annual salary of $16,900. Her salary was increased, effective May 1, 1978, to $19,500, on August 27, 1979 to $22,000. On September 6, 1980, she was evaluated by her supervisor, Dr. Penna, who found her to be a "satisfactory" employee. Ms. Gerson generated some project ideas of her own during the period of her employment, which were approved by APHA and later completed by Ms. Gerson. She nevertheless submitted her resignation from defendant's employ, effective June 12, 1981. She satisfactorily performed her duties up until the effective date of her resignation.

Dr. Herrmann commenced employment with APHA on the same day as plaintiff, as a staff member in the Association's Professional Affairs Division. Dr. Herrmann's job title was Director of Clinical Practices, and his starting salary was $26,000. Dr. Herrmann was passed over for a salary raise on the first anniversary of his employment. He was given a raise in salary on August 27, 1978 to $27,040. He received no other raises in salary while employed at APHA. In August 1979, Dr. Herrmann's job performance was evaluat-ed by Dr. Richard P. Penna, his immediate supervisor, and he was deemed to be average or slightly below average. In five out of six areas of evaluation, Dr. Herrmann scored a three or four, out of a possible eight. *See* J.S., Ex. F. Dr. Herrmann frequently reported to work late. After reporting to work, he would often "disappear" for lengthy periods during the day. As a result, Dr. Herrmann was unable to keep up with his own assignments, or provide meaningful input and guidance to other staff members in his area of responsibility.

In some instances, Dr. Herrmann failed to develop continuing education programs within his area of responsibility as planned by APHA so the development of these programs had to be reassigned to outside contractors. By mid-1979, Dr. Herrmann's performance had deteriorated to the point where he was unable to complete the majority of projects assigned to him and his analytical and communication skills were substantially impaired. After providing Dr. Herrmann with notice of his termination and some time to obtain employment, APHA advised him that he would be terminated by June 20, 1980. Dr. Herrmann thereafter resigned from APHA effective July 11, 1980.

The job description for Director of Clinical Practices indicates that Dr. Herrmann was required to work with APHA in connection with clinical pharmacy, nuclear pharmacy, drug utilization review programs, institutional acute pharmacy practice, and professional standards review organizations [PSRO's]. *See* J.S., Ex. D; Penna *Affidavit*. A 5; *see also* Plaintiff's Memorandum of Points and Authorities in Opposition To Defendant's Motion for Summary Judgment (Plaintiff's Memo) at 5. Ms. Gerson as Director of Special Projects was required to work in the areas of Long Term Care, Home Health Care, Medicare/Medicaid and Health Maintenance Organizations. *See* J.S., Ex. B; *Gerson* deposition at 15–21, 47–55, 63. Plaintiff asserts that the two positions required equal work skill and responsibility.

First, plaintiff argues that there is a genuine issue of fact as to whether the two jobs involved were substantially equal under the EPA because they allegedly required equal skill, effort and responsibility. It is abundantly clear from the submissions of each party that the two were not substantially equal as envisaged by the drafters of the EPA.

The affidavit of Dr. Apple sets forth what the Court views as sound and practical reasons for holding the job that Dr. Herrmann occupied as more demanding than that of Ms. Gerson, and consequently deserving more compensation. The affidavit makes it clear that APHA expected a great deal more from Dr. Herrmann as Director of Clinical Practices than was expected of Ms. Gerson as Director of Special Projects. Dr. Apple, who served as the Chief Executive Officer of APHA, had full and final responsibility for the employment of all APHA staff members, as well as their initial salaries and periodic salary increases. Dr. Apple personally approved the employment, initial salaries and periodic salary increases of both Dr. Herrmann and Ms. Gerson.

With regard to hiring these two employees, Dr. Apple, states in pertinent part that:

6. In January, 1977, Dr. Pierre S. Del Prato, a member of the APHA Professional Affairs Division staff, resigned his position. Dr. Del Prato, at the time of his resignation, was responsible for Professional Affairs Division on going activities relating to institutional pharmacy, clinical pharmacy, Professional Standards Review Organization, drug utilization review programs and procedures, and nuclear pharmacy. His departure required an expeditious search for a pharmacist qualified to replace him and to assume responsibility immediately for those ongoing activities with a minimum of supervision. I authorized Dr. Richard P. Penna, Director of the Professional Affairs Division, to promptly recruit a pharmacist appearing to have such qualifications.

8. After reviewing Dr. Herrmann's *curriculum vita* and taking with him by telephone, Dr. Penna recommended to me that Dr. Herrmann be considered to succeed Dr. Del Prato. We then had Dr. Herrmann in for a personal interview and I decided to try to recruit him. Dr. Herrmann appeared to be a particularly appealing candidate for the position because of his Doctor of Pharmacy (Pharm.D.) degree and his extensive practical experience in the field of institutional pharmacy practice—one of his planned areas of primary job responsibility. Dr. Herrmann also had extensive experience running continuing education programs. Taking into account the current salary and responsibilities of the position to be filled together with Dr. Herrmann's education background and professional experience, as well as his current salary as Chief Pharmacist in a hospital in Florida, an initial salary of $26,000 was negotiated and Dr. Herrmann agreed to join the APHA staff to assume Dr. Del Prato's responsibilities and to take on other responsibilities to be later agreed upon. Although Dr. Herrmann could not begin his employment with APHA until early June of that year, Dr. Penna believed, and I agreed, that the Association was not likely to find an apparently better qualified candidate to replace Dr. Del Prato before Dr. Herrmann could join the APHA staff. His employment was therefore confirmed on the basis of guideline (A) described above.

9. I first learned of Ms. Gerson interest in employment with APHA through Pharmacist Robert Schwartz of Madison, Wisconsin. Mr. Schwartz is a long-time personal friend and former student of mine when I was a member of the faculty at the University of Wisconsin prior to becoming the Chief Executive Officer of APHA. Ms. Gerson was, or had been, working with Mr. Schwartz at his pharmacy in Madison for approximately five months and was looking for other employment.

10. Mr. Schwartz spoke highly of Ms. Gerson and her interest in Association work. Because of his personal recommendation, I decided to see whether a position could be made available for her under guideline (B) described above. Dr. Penna reviewed Ms. Gerson's educational background and professional experience and we had her in for a personal interview to determine whether he would be able to give her some meaningful assignments and whether he would have sufficient time available to supervise her work. Dr. Penna informed me that he wished to initiate the development of background papers and educational programs regarding pharmaceutical services in long-term care facilities, based on some initial work done in this area by a former staff member. He also stated that he believed Ms. Gerson had the capacity to develop such activities under his direction. He indicated he would be able to provide adequate guidance and supervision for Ms. Gerson with regard to long-term care activities were she to be employed by the Association. Based on all these factors, I determined that we could provide Ms. Gerson employment and training and offered her an initial salary of $16,900, which was in the general range of initial salaries then being paid by the Association under similar circumstances to other pharmacist staff members, male and female, with comparable educational backgrounds and professional experience. Ms. Gerson accepted employment with APHA on these terms.

Apple Affidavit.

Dr. Penna's uncontroverted and unchallenged affidavit sets forth the functions, duties and responsibilities of both Ms. Gerson and Dr. Herrmann as follows:

3. The functions, duties, and responsibilities of Cyrelle K. Gerson as a staff member of the Professional Affairs Division were to develop programs and activities in the area of long-term care and home health care.

4. Ms. Gerson was to maintain awareness of the professional and scientific literature and to serve as a staff resource in the development of articles for APHA publications and editing other publications for use by pharmacists involved in long-term care and home health care. She also served as a staff resource and assisted in the planning and presentation of continuing education programs for the long-term Care Section of the APHA Academy of Pharmacy Practice and represented APHA at meetings, conferences, and symposia dealing with the providing of pharmaceutical service in long-term care situations. Ms. Gerson had specific staff liaison responsibilities with the American Red Cross as well as a few organizations representing various health care providers serving the home health care patient. Finally, Ms. Gerson was responsible for following legislative and regulatory developments, including those in the Medicare and Medicaid programs, affecting providers of pharmaceutical service in long-term and home health care situations. In this connection, she assisted in preparing Association position statements regarding such developments.

5. The function, duties, and responsibilities of Dr. Arthur P. Herrmann, Jr., as a staff member of the Professional Affairs Division were to maintain an awareness of the professional and scientific literature regarding developments in clinical pharmacy, nuclear pharmacy, drug utilization review programs and procedures, institutional acute care pharmacy practice, and professional standards review organizations (PSRO's). Dr. Herrmann served as the Association's primary staff information resources in the development of continuing education programs, articles and other activities relating to clinical pharmacy and nuclear pharmacy, and served as staff resource and assisted in program planning and presentation for the Section on Nuclear Pharmacy of the APHA Academy of Pharmacy Practice. Dr. Herrmann also represented the Association at meetings, conferences, and symposia dealing with the foregoing ar-

eas of pharmacy practice and also professional standards review organizations. Dr. Herrmann has specific staff liaison responsibilities for the American Academy of Pediatrics, the American Academy of Physician Assistants, the American Society of Internal Medicine, the Office of Professional Standards Review (Department of Health, Education, and Welfare), and the Bureau of Quality Assurance (Department of Health, Education, and Welfare). Finally, Dr. Herrmann was responsible for maintaining an awareness of legislative and regulatory developments affecting pharmacists involved in clinical pharmacy, nuclear pharmacy, drug utilization review programs and procedures, and acute care institutional practice. He was also responsible for following similar developments regarding professional standards review organizations as they might affect pharmacists and pharmacy practice. In this connection, Dr. Herrmann assisted in preparing Association position statements with regard to such legislative and regulatory proposals.

6. When Ms. Gerson was employed as a staff member in the Professional Affairs Division, she had no prior administrative experience or experience in long-term care. She was assigned this subject area because, based on preliminary work done by a staff member who had left APHA employ a year earlier, I wished to develop programs and activities to meet the needs of practitioners involved in, or contemplating involvement in, this expanding area of pharmacy practice. Ms. Gerson's assignment thus offered her the opportunity to establish a new area of continuing education program activity for APHA and an opportunity to develop what I believed to be her excellent potential as a staff member of the Professional Affairs Division.

Penna Affidavit.

Plaintiff admits that Ms. Gerson "does not specifically dispute the purely factual representations presented in the affidavits accompanying defendant's Motion for Summary Judgment ... but ... contend[s] that the information presented plus Ms. Gerson's deposition allows for a determination that the work performed by the two employees was indeed equal ...." *See* Plaintiff's Memorandum at 6. However, the affidavits point to only one conclusion; that these two jobs were not substantially equal in terms of functions, duties and responsibilities.

The Court has carefully considered responses made by plaintiff in her deposition. The deposition adds nothing in the way of specific facts and allegations about which a genuine issue exists. The deposition contains statements that are conclusory and unsubstantiated. Moreover, the deposition also contains hearsay which the Court cannot consider in deciding on a motion for summary judgment. For example, Ms. Gerson alludes to several matters which she "believes," or "suspects" might have been taking place. The uncontroverted facts in the affidavits, the job descriptions and plaintiff's own deposition establish that the training, skills and experience of Dr. Herrmann far exceeded that of Ms. Gerson. *See Affidavits* of Dr. Penna and Dr. Apple; J.S. Exs. B and D; Gerson dep. at 45–47. With regard to the background of the two employees, Dr. Penna states:

8. When Dr. Herrmann was employed as a staff member in the Professional Affairs Division, he had acquired the Doctor of Pharmacy (Pharm.D.) degree (in addition to his baccalaureate degree) and had substantial professional experience in the areas of "institutional practice" (hospital pharmacy practice) and "clinical pharmacy practice" (nondispensing, patient and prescriber consultation functions). He had participated in several continuing education programs for pharmacists. He also had a record of administrative experience as an Army Pharmacy Officer. At the time of his employment, APHA was heavily involved in programs and activities dealing with these areas of pharmacy practice. Dr. Herrmann, in fact was employed to replace Dr. Pierre S. Del Prato who had previously been responsible for clinical

pharmacy, institutional pharmacy, nuclear pharmacy, drug utilization review, and PSRO's within the Professional Affairs Division but she had resigned and left the staff in late January, 1977.

9. Because Dr. Del Prato had been responsible for these ongoing activities, his departure left a serious void in the Professional Affairs Division staff. Therefore, I was anxious to replace him as soon as possible, and when Dr. Herrmann's credentials and interest in the position became known to me in the Spring of 1977, I undertook to recruit him. Although he could not actually join the APHA staff until June, 1977, his educational background and professional experience appeared to me to be of sufficient value that I was willing to wait. Penna Affidavit.

The resumes submitted by both parties support the statements made by Dr. Penna in his affidavit. The resumes demonstrate, unequivocally, that Dr. Herrmann, at the time of hiring, possessed superior academic training as well as far more practical experience than Ms. Gerson. Ms. Gerson states that the extent of her practical experience—outside the academic world and since receiving her Bachelor of Science degree in 1975—consisted of work in a local pharmacy in Madison, Wisconsin, twelve hours a week, for about four or five months. *See* Gerson deposition at 7–8. Review of the two resumes indicate that Dr. Herrmann received his Bachelor of Science degree in Pharmacy from George Washington University in 1961, and his doctorate in Pharmacy in 1973. Dr. Herrmann's resume also shows that he has worked in numerous pharmacy related jobs, most often in very responsible positions. Ms. Gerson's resume shows that she received a Bachelor of Science degree in Pharmacy in 1975, some fifteen years after Dr. Herrmann. There is also no indication that Ms. Gerson had or has now obtained a doctorate degree in Pharmacy. Her resume does indicate that she has a Masters degree in Organic Chemistry, and a Bachelor of Science degree in Pharmacy. However, plaintiff has failed to demonstrate to the Court just how these degrees are substantially equal to a doctorate degree in pharmacy.

## II

As aforementioned, the gravamen of plaintiff's contention is that two subject employees were doing equal work on jobs requiring equal skill, effort and responsibility, but that they were not receiving equal pay. APHA contends, on the other hand, that the jobs were not equal and that the pay differential was ostensibly based upon factors other than gender. Thus, the controlling issue before the Court is whether the jobs that Ms. Gerson and Dr. Herrmann were hired to perform required equal skill, effort and responsibility.

It is conceded that the two positions were not identical. *See* J.S. RR 10, 12, 14, 22, 23 and 25. The job descriptions attached to the Joint Stipulation are illustrative of this point as well. It is well settled in this jurisdiction that jobs need not be identical to find violations of the Act. *See Corning Glass Works v. Brennan,* 417 U.S. 188, 203 n. 24, 94 S.Ct. 2223, 2232 n. 24, 41 L.Ed.2d 1 (1974); *accord Laffey v. Northwest Airlines, Inc.,* 185 U.S.App.D.C. 322, 567 F.2d 429 (1976). When jobs are not identical the proper test in this jurisdiction to determine equality is whether the jobs are substantially similar. *See Thompson v. Sawyer,* 219 U.S.App.D.C. 393, 678 F.2d 257 (1982).

The EPA provides in pertinent part:
[n]o employer ... shall discriminate ... between employees on the basis of sex by paying wages to employee ... for equal work on jobs the performance of which requires equal skill, effort and responsibility, and which are performed under similar working conditions....

29 U.S.C. § 206(d)(1). With respect to plaintiff's allegations in the instant case, the EPA prohibits payment of unequal wages for equal work on grounds of sex, unless the difference is justified by one of four enumerated defenses: a seniority system, a merit system, a system that measures pay by quality or quantity of produc-

tion, or any other factor not based on sex. *Id.*

A recent case rendered in this jurisdiction which discusses discrimination liability under the EPA is *Thompson.* Judge Mikva, writing for the Court of Appeals, therein outlined the prevailing legal standards and principles involved in establishing violations of the EPA. The Court of Appeals noted in pertinent part:

An employer violates the Equal Pay Act by paying unequal wages for equal work on jobs the performance of which requires equal skill, effort and responsibility and which are performed under similar working conditions. 29 U.S.C. 206(d)(1) (1976). Determination that an Equal Pay Act violation has occurred involves both a legal and a factual problem. The legal issue is the standard of equality to be applied under the Act. The factual issue is whether the jobs in question met the standard, and the burden of proof is on the plaintiff to show that they did. Once plaintiffs meet their burden, then the burden shifts to defendants to show that the pay differential was justified under one of the exceptions of the Act.

*Thompson,* 219 U.S.App.D.C. at 406–407, 678 F.2d at 270–271. (citations omitted).

As far as the proper legal standard to be applied, the Court of Appeals went on to state:

In applying the term "equal work," Courts have been led by the legislative history toward a "substantially equal" test, a middle course between a requirement that the jobs in question be "exactly alike" and a requirement that they be merely "comparable." This middle path was adopted by the Supreme Court on its only full scale treatment of the Equal Pay Act.

*Id.,* 219 U.S.App.D.C. at 407–408, 678 F.2d at 271–272 (footnotes and citations omitted).

In *Laffey, supra,* the Court of Appeals, in reliance upon the Supreme Court's decision in *Corning Glass,* adopted the "substantially equal" test in determining job equality. In discussing the test the Court averred:

[T]he phrase "equal work" does not mean that the jobs must be identical, but merely that they must be "substantially equal." A wage differential is justified only if it compensates for an appreciable variation in skill, effort or responsibility between otherwise comparable job work activities.

185 U.S.App.D.C. at 342, 567 F.2d at 449 (citation omitted).

Although the Department of Labor was not given rulemaking power under the Equal Pay Act—House Report at 3, 109 Cong.Rec. 9209—courts have given "great deference" to regulations adopted by this agency to guide the application of equal standards. *See Federal Election Commission v. Democratic Senatorial Campaign Commission,* 454 U.S. 27, 37, 102 S.Ct. 38, 44, 70 L.Ed.2d 23 (1981); *Thompson, supra* 678 F.2d at 273; *Laffey, supra* 567 F.2d at 449. More specifically, when faced with the determination of whether work performed on different machines or equipment, or in different capacities is "substantially equal", courts have looked to one regulation which states:

"Insubstantial or minor differences in the degree or amount of skill, effort, or responsibility required for the performance of jobs will not render the equal pay standard inapplicable." 29 C.F.R. 800.122. Quoting *Corning Glass,* Judge Robinson noted in *Laffey:*

Courts have consistently held that differences in the duties respectively assigned male and female employees must be "evaluated as part of the entire job." Thus, if in the aggregate the jobs require substantially similar skills, efforts and responsibilities, the work will be adjudged equal despite minor variations.

When there is disparity between salaries paid men and women for similar positions bearing different titles... the Courts have scrutinized the evidence to discern whether the salary differential is justified by heterogeneous duties .... An employer cannot justify a pay differ-

ential by mere assumptions on career-orientation, the duration or probable length of working time, or a supposed respect for male authority and leadership.... 

An employer must show a consistent pattern of performance of additional duties in order to demonstrate that added duties are genuinely the motivating factor for the substantially higher pay.... The semblance of a valid job classification system may not be allowed to mask the existence of wage discrimination.

Often, evidence superficially purporting to justify greater pay as compensation for added work is found upon close examination to have inconsistencies which render its evidentiary value weaker....

185 U.S.App.D.C. at 342–343, 567 F.2d at 449–50 (citations omitted).

 With the foregoing principles in mind, and based on the Court's review and analysis of the uncontroverted facts of this case, the Court finds that it can decide as a matter of law that plaintiff's claim lacks a sufficient foundation. The Court finds that the two positions were not "substantially equal." Plaintiff has not satisfied the legal standards set out above. As indicated by the Joint Stipulation of Facts, Ms. Gerson was hired as Director of Special Projects, while Dr. Herrmann was hired to replace Dr. Del Prato as Director of Clinical Practices. *See* Affidavit of Dr. Apple, pp. 5–8.

Plaintiff has neither stated a claim nor presented factual evidence which establishes that defendants discriminated against her on the basis of sex. More particularly, she has not shown or suggested how she was treated differently from males. The affidavits submitted by the two APHA administrators charged with the responsibility of hiring and supervising APHA personnel, are totally devoid of even a hint or scintilla of sexually discriminatory intent or practices.

The undisputed facts before the Court demonstrate that a sincere effort was made to provide Ms. Gerson with meaningful employment, absent any sexual preferences or prejudices. The undisputed facts indicate that Dr. Herrmann was actively recruited to fill a specific and highly technical existing job, whereas a position was created by APHA as a policy gesture to give Ms. Gerson an opportunity to acquire pharmaceutical experience and training on the job. No specific incidents, allegations or facts have been offered by the plaintiff in support of the vague and generalized references to sexual discrimination. On the other hand, defendant has shown that it made rational, reasonable and legally prudent personnel decisions involving these two employees. Defendants are therefore entitled to summary judgment as a matter of law.

An appropriate Order has been entered by the Court.