**Hazel IBRAHIM, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 90–117C.**

United States Claims Court.

June 19, 1992.

Robert A. Filpi, Chicago, Ill., for plaintiff.

Hillary A. Stern, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant.

## ORDER

MOODY R. TIDWELL, III, Judge:

This case is before the court on defendant's motion for partial summary judgment, and on the parties' cross-motions for summary judgment pursuant to RUSCC 56. For the reasons set forth below, the court denies plaintiff's motion for summary judgment and grants defendant's cross-motion.

### FACTS

On September 13, 1987, Hazel Ibrahim began working as a Housing Management Specialist (HMS) for the Department of Housing and Urban Development (HUD) in Chicago, Illinois.[1] The position had been advertised at the GS–9, GS–11, and GS–12 levels. To be eligible for GS–11 and GS–12, applicants needed at least three years of general experience and three years of specialized experience. Moreover, as part of the specialized experience, "a knowledge of Federal regulations and codes concerning the use and operation of Government-owned, leased, rented, or otherwise controlled land or housing assets" was specifically required. Although Ibrahim had been a licensed real estate salesperson, part owner of a real estate agency, and "active-

[1.] The Office of Personnel Management has issued the following partial description of the general duties of a HMS:

Housing Management Specialists and Assistants perform work involved in the evaluation of housing management programs, the development of administrative procedures, and providing [sic] advice and technical assistance related to the management of either Government-owned and operated housing projects or the housing management programs of local housing authorities which own and operate public housing under Federal financial assistance contracts.

. . . .

... the work requires knowledges of the principles, techniques, and methodology of administering housing programs and projects and skill in the direct or indirect management of major housing activities such as: housing operation and maintenance; cost management and financial planning; eligibility and assignments; housing requirements surveys; new construction and improvements; and management-tenant relations.

ly involved in the sale and leasing of multi-family residential real estate and commercial real estate for over 14 years," she did not possess specific knowledge of federal regulations and codes. Accordingly, HUD offered plaintiff employment at the GS–9 level, and plaintiff accepted. At all times during plaintiff's employment, the time-in-grade restrictions contained in 5 C.F.R. § 300.604 (1992), were in effect.[2]

Plaintiff began working, and is still employed, in the Management Division of HUD. The Management Division is comprised of a program support branch, an engineering branch, and three general management branches known as Branch A, Branch B, and the Chicago Housing Authority (CHA) Branch. Branch A has three HMSs at the GS–12 level, all of whom are male. Branch B, plaintiff's branch, has three male HMSs at the GS–12 level, and plaintiff who is currently at the GS–11 level. The CHA Branch employs one female and two male HMSs, all at the GS–12 level. Each general management branch is overseen by a GS–13 Supervisory Housing Management Specialist, and two of the three supervisors are female. The Director of the Management Division is the immediate supervisor of the general management branch supervisors, and is also female.

After spending her first three months reading HUD manuals, Ibrahim was given a full case load on December 13, 1987. She was assigned to work with ten counties, three of which had no active Public Hous-ing Authorities (PHAs).[3] The largest PHA that plaintiff had responsibility over was located in St. Clair County, and contained 1,018 Conventional Public Housing (CPH) units. HUD describes large Housing Authorities as having 1,250 or more CPH units. Nearly all HMSs in the three branches at the GS–12 level had authority over at least one large Housing Authority; those that did not had compensating duties. For example, Lionel Nixon, the American Federation of Government Employees (AFGE) Union President, devotes 50 percent of his work time to union activities and is responsible for only six active Housing Authorities. Another GS–12, Anthony Stanford—while not listed as being in one of the three general management branches—is the Comprehensive Improvement Assistance Program (CIAP) coordinator for State of Illinois programs. The three GS–12s in the CHA Branch share responsibility for the CHA's 39,277 CPH units.

On September 25, 1988, after working one year as a GS–9, plaintiff was promoted to GS–11. Plaintiff became eligible for promotion to GS–12 on September 25, 1989, but has remained a GS–11. Since June 1989, no HMSs in the Chicago Office have been promoted from GS–11 to GS–12. On February 6, 1990, plaintiff filed suit in this court alleging that HUD's failure to promote her to GS–12 constituted gender discrimination. In her complaint, plaintiff also asserted that she had regularly performed work at the GS–12 level since De-

**2.** The relevant portions of section 300.604 are as follows:

(a) *Advancement to positions at GS–12 and above.* Candidates for advancement to a position at GS–12 and above must have completed a minimum of 52 weeks in positions no more than one grade lower (or equivalent) than the position to be filled.

(b) *Advancement to positions at GS–6 through GS–11.* Candidates for advancement to a position at GS–6 through GS–11 must have completed a minimum of 52 weeks in positions:

(1) No more than two grades lower (or equivalent) when the position to be filled is in a line of work properly classified at 2–grade intervals....

Thus, according to this provision, plaintiff was required to spend a year as a GS–9 before being promoted to GS–11, and then a year as a GS–11 before being eligible for advancement to GS–12. Positions at the GS–12 level and above are filled by competitive merit staffing.

**3.** HUD subsidizes a variety of programs. Some of the programs that may be assigned to a HMS include "the low rent public housing program, the Comprehensive Improvement Assistant Program ("CIAP"), the Section 8 existing progr[a]m, the Section 8 substantial rehabilitation program, the Section 8 new construction program, [the] Section 23 leased housing program, [the] turnkey 3 home ownership program, [the] housing voucher program, and [the] public housing drug elimination program." Some of these programs are administered through PHAs and others are administered privately; only "the housing voucher program, the Section 8 existing program, and the Section 8 moderate rehab program have to be operated by a PHA."

cember 13, 1987. The complaint sought back pay and an order directing HUD to retroactively promote plaintiff. On July 26, 1991, defendant moved for partial summary judgment. Plaintiff moved for summary judgment on September 17, 1991, and defendant cross-moved for summary judgment.[4]

## DISCUSSION

Summary judgment is appropriate when "there is no genuine issue as to any material fact" so that the moving party "is entitled to judgment as a matter of law." RUSCC 56(c) (1991). In evaluating a motion for summary judgment, any doubt as to whether a genuine issue of material fact exists must be resolved in favor of the non-moving party. *Adickes v. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970); *Campbell v. United States*, 2 Cl.Ct. 247, 249 (1983). A genuine issue of material fact is one that would change the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Chevron U.S.A., Inc. v. United States*, 17 Cl.Ct. 537, 540 (1989), *rev'd on other grounds*, 923 F.2d 830 (Fed. Cir.1991).

When the moving party has carried its burden, the non-moving party must come forward with specific facts showing that a genuine issue for trial exists, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986), and the non-moving party may not discharge its burden by cryptic, conclusory, or generalized responses. *See Willetts v. Ford Motor Co.*, 583 F.2d 852, 856 (6th Cir.1978); *Tunnell v. Wiley*, 514 F.2d 971, 976 (3d Cir.1975). "[When] the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* 475 U.S. at 587, 106 S.Ct. at 1356 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)).

The court agrees with the parties that this case presents no genuine issues of material fact, and that summary judgment is appropriate.

### I. The Equal Pay Act.

Plaintiff's claims of discrimination and for back pay arise under the Equal Pay Act of 1963, Pub.L. No. 88–38, 77 Stat. 56 (codified as amended at 29 U.S.C. § 206(d) (1988)). The Equal Pay Act was passed as an amendment to the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201–219 (1988), and extended to the federal government in 1974. *See* 29 U.S.C. § 203(e)(2). It sought to overcome the age-old belief in the inferiority of women and to eliminate the economic and social consequences which flow from it. *Shultz v. Wheaton Glass Co.*, 421 F.2d 259, 265 (3d Cir.1970). "The Equal Pay Act is broadly remedial, and it should be construed and applied so as to fulfill the underlying purposes which Congress sought to achieve." *Corning Glass Works v. Brennan*, 417 U.S. 188, 208, 94 S.Ct. 2223, 2234, 41 L.Ed.2d 1 (1974).

To establish a prima facie case under the Equal Pay Act, a plaintiff has the burden of proving that work has been performed similar to that performed by employees of the opposite sex involving equal skill, effort, and responsibility; that the work was performed under similar working conditions; and that the employer paid different wages to employees of opposite sexes for such work. *Corning Glass Works*, 417 U.S. at 195, 94 S.Ct. at 2228; *E.E.O.C. v. Maricopa County Community College Dist.*, 736 F.2d 510, 513 (9th Cir. 1984). Jobs need not be identical to be substantially equal, *Shultz*, 421 F.2d at 265, and minor differences in job duties are not sufficient to avoid the application of the Act. *See Corning Glass Works*, 417 U.S. at 203 n. 24, 94 S.Ct. at 2232 n. 24.

Once a prima facie case has been established, the burden of proof shifts to the defendant to show that the wage disparities fall under a permissible exception

**4.** Since the court grants defendant's cross-motion for summary judgment, defendant's partial motion for summary judgment is moot.

to the Equal Pay Act. *Molden v. United States,* 11 Cl.Ct. 604, 612 (1987). The Act allows differences in employee compensation made "pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any factor other than sex." 29 U.S.C. § 206(d)(1).

Here, plaintiff asserted that she had been consistently performing GS–12 level work since December 13, 1987, but, because of her gender, did not receive GS–12 wages. Plaintiff's claim fails for two reasons: (1) time-in-grade restrictions prevented Ibrahim from receiving GS–12 wages until at least September 25, 1989; and (2) at no time did Ibrahim perform work at the GS–12 level.

## II. The Time–In–Grade Provisions.

█ Assuming, *arguendo,* that plaintiff had met her burden of proving a wage disparity for performing substantially similar work, defendant could successfully rely on the time-in-grade provisions to defeat the portion of plaintiff's claim covering her employment until September 25, 1989. HUD determined that plaintiff was eligible to be hired at the GS–9 level because she lacked the specific knowledge of federal regulations and codes required by higher-graded positions. Plaintiff accepted a GS–9 position and became bound by the advancement restrictions contained in 5 C.F.R. § 300.604 (1992). Accordingly, plaintiff could not be promoted to the GS–11 level until September 25, 1988, and the earliest she was eligible for promotion to the GS–12 level was September 25, 1989. *See* 5 C.F.R. § 300.604.

Plaintiff argued that the time-in-grade restrictions could not override the provisions of the Equal Pay Act. However, the Act specifically allows exceptions made pursuant to a seniority system, a merit system, or "a differential based on any factor other than sex." 29 U.S.C. § 206(d)(1). The time-in-grade restrictions were enacted to prevent "excessively rapid promotions in competitive service ... positions and to protect competitive principles.

[The restrictions] provide a budgetary control on promotion rates and help assure that appointments are ... appropriate...." 5 C.F.R. § 300.601. The court finds that the time-in-grade restrictions are not based on gender, and are permissible exceptions to the Equal Pay Act. *See* 29 U.S.C. § 206(d)(1).

Assuming, *arguendo,* that the time-in-grade restrictions would not have prevented plaintiff from recovering back pay before September 25, 1989, plaintiff would not be entitled to back pay for any time during her employment with HUD since she was never given GS–12 level work.

## III. Plaintiff Never Performed Work at the GS–12 Level.

█ As described in the position description of a GS–12 HMS, a GS–12 HMS serves as an authority on "all or one of the following: a diverse portfolio of HUD programs, a large Public Housing Authority (1250 or more units), or a financially trouble[d] or operationally troubled housing authority." Additionally, a GS–12 HMS "is responsible for developing housing program management plans and develops [*sic*] workout plans for financially troubled and operationally troubled housing authorities criteria and resolves [*sic*] unusually complex program management problems as they relate to [the] specific areas of responsibility listed above." In contrast, the duties of the GS–11 HMS are described as follows:

The incumbent is assigned housing programs and is the principal point of contact with public and private local agencies and sponsors on housing management activities. The incumbent provides management assistance with respect to all agency-assisted or insured multifamily housing programs and is responsible for developing housing program management plans and criteria and resolving program management problems as they relate to a diverse portfolio of HUD programs, or a Public Housing Agency.

Although the duties of the two positions are by nature closely related, their position descriptions clearly indicate an important distinction: only a GS–12 HMS is given

authority over large or troubled PHAs.[5] Here, plaintiff was never assigned a large or troubled PHA.

The largest PHA that plaintiff had authority over was the St. Clair County Housing Authority, which contained only 1,018 Conventional Public Housing Units. HUD defines a large PHA as one having 1,250 or more Conventional Public Housing Units.[6] Plaintiff admitted that "technically" St. Clair constituted a medium PHA, but disingenuously sought to meet the HUD definition of a large PHA by aggregating units from other programs operated by St. Clair.[7] The court, however, is not at liberty to change HUD's definition and must conclude that St. Clair is not a large PHA.

Moreover, no PHA assigned to plaintiff was ever designated by HUD as troubled. Troubled PHAs are those "which require intensive and extraordinary monitoring and assistance, because of significant operational or financial problems." An HMS having responsibility over a troubled PHA follows special procedures designed to elicit "[s]ignificant, expeditious, [and] long-lasting improvements ... sufficient to ultimately allow the PHA to reach the standards needed to indicate that the PHA is well managed." Large PHAs are designated troubled by the Secretary of HUD, while small and medium-sized PHAs are so designated by the Regional Office. In all cases, the HMS has the ability to recommend that a PHA be designated as troubled. Here, plaintiff has never recommended that any of her PHAs be considered troubled, and none have ever been so designated by HUD.

Plaintiff also argued that because St. Clair had previously been assigned to a GS–12 HMS, her current responsibility over that PHA merited a GS–12 salary. This argument is, in the words of the late Chief Judge Marvin Jones of the United States Court of Claims, "singularly free from any suspicion of logic." *Belcher v. United States*, 94 Ct.Cl. 137, 140 (1941). Both GS–11 and GS–12 HMSs are eligible to work with small or medium-sized PHAs that are not troubled. Simply because St. Clair was previously assigned to a GS–12, does not mean that plaintiff required a promotion in order to work with it.

In a related argument, plaintiff asserted that her work with the Property Disposition (PD) Set Aside Program constituted GS–12 level work because the program had been previously handled by Lionel Nixon, a GS–12.[8] As stated above, plaintiff is not entitled to a GS–12 salary simply because the program previously had been managed by a GS–12 HMS. Furthermore, Lionel Nixon, before he became the AFGE Union President, spent 100 percent of his time managing the PD Set Asides whereas plaintiff was told to devote only 50 percent of her time to the program and was assisted by Anthony Stanford, then a GS–11 HMS. Plaintiff also argued that because HUD later advertised an opening for a PD Set Aside Coordinator at the GS–12 level, she should have been similarly compensated for her work with the program. Although that position was never filled, the PD Set Aside Coordinator would have spent 50 percent more time administering the program than had plaintiff. Working

---

5. Plaintiff argued that her portfolio was as diverse as the portfolios of male GS–12 HMSs, and that this factor merited a GS–12 salary. The court notes, however, that both jobs required a HMS to work with a "diverse portfolio of HUD programs." Therefore, diversity cannot be a distinguishing factor between the two positions.

6. HUD material submitted to the court described a large PHA as having "1,250 or more units." The deposition of Maryann Taranowski, Director of the Management Division, and the work assignments of GS–12 HMSs in the Chicago Office made clear that the "units" referred to were Conventional Public Housing Units.

7. The St. Clair County Housing Authority consists of: 1,018 Conventional Public Housing Units; 1,003 Section 8 Existing Units; 621 Section 8 Voucher Units; 6 CIAP Programs; a Resident Initiative Grant; and a Drug Free Grant.

8. As described by defendant, PD Set Asides "are privately owned multi-family section 8 subsidized units in which a private developer buys a multi-family apartment from HUD under an agreement in which he will renovate and make the building available for section 8 subsidized tenants for 15 to 20 years."

with the PD Set Asides on a full-time basis would reasonable involve more "skill, effort, and responsibility" than working with the program on a part-time basis. *See Molden,* 11 Cl.Ct. at 610. Accordingly, plaintiff has failed to show that she was paid less for performing work substantially similar to that performed by male employees.

Finally, plaintiff argued that her work was comparable to two GS–12 HMSs who were not assigned large or troubled PHAs: Lionel Nixon and David McMullin. Lionel Nixon attained the GS–12 level before becoming president of the AFGE Union, and his workload was reduced to comply with a union agreement which requires him to spend 50 percent of his time on union-related activities. Mr. Nixon remains responsible for six active PHAs. David McMullin is responsible for nine active PHAs, the Illinois Department of Commerce and Community Affairs (IDCC), the Illinois Housing Development Authority (IHDA), and the Leadership Council.[9] Mr. McMullin's GS–12 salary is based on his responsibility for the IDCC, the IHDA, and the Leadership Council. Both men have unique assignments which are not comparable to plaintiff's duties. Plaintiff has failed to show that her assignment is substantially similar to the assignment of any GS–12 HMS in the Chicago Office of HUD. Accordingly, plaintiff is not entitled to back pay for any time of her employment.

## CONCLUSION

At no time during her employment at HUD did plaintiff perform work at the GS–12 level. Although her assignment reflects a diverse portfolio of HUD programs, plaintiff has never had authority over a large or troubled PHA. Plaintiff's work with the PD Set Aside program did not merit a GS–12 rating; nor was her work in general comparable to that performed by GS–12 HMSs. Furthermore, even if she had been performing GS–12 work, time-in-grade restrictions would have prevented

plaintiff from recovering back pay before September 25, 1989. In sum, not an iota of evidence exists that Ibrahim suffered the indignity of gender discrimination.

Following a careful examination of each parties' motion, and giving the proper presumptions and preferences required by the law of summary judgment, the court finds that neither party has presented genuine issues of material fact to be tried and that plaintiff is not entitled to back pay. Therefore, the court denies plaintiff's motion for summary judgment and grants defendant's cross-motion for summary judgment. The Clerk of the court is directed to dismiss the complaint. Costs to defendant.

IT IS SO ORDERED.

---

**9.** The Leadership Council is a private, non-profit organization that manages a Section 8 rent sub-    sidy program.